Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL. <br>       Plaintiffs, <br> vs. <br><br> LEANNE MARTEN, Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, and UNITED STATES FISH & WILDLIFE SERVICE, an agency of the U.S. Department of Interior. <br><br>       Defendants. | CV- 20- <br><br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## I. INTRODUCTION

1.  This is a civil action for judicial review under the citizen suit provisions of the Administrative Procedure Act and Endangered Species Act of the U.S. Forest Service's (Forest Service) authorizations, practices, analyses, and lack thereof on the Helena-Lewis and Clark National Forest (Forest) related to and regarding the Stonewall Vegetation Project (Project) and Forest Plan Amendment #35.

2.  Plaintiffs Native Ecosystems Council and Alliance for the Wild Rockies attest that the decisions approving the challenged authorizations, practices, analyses, and lack thereof are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3.  Defendants' actions or omissions violate the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 *et seq.*, the National Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.*, the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*

4.  Plaintiffs request that the Court either vacate the decision authorizing the Project and Forest Plan Amendment pursuant to 5 U.S.C. § 706(2)(A) and/or 16 U.S.C. § 1540(g) and/or enjoin implementation of the Project.

5.  Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs

and expenses of suit, including attorney and expert witness fees pursuant to

the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or the Endangered

Species Act, 16 U.S.C. § 1540(g)(4), and such other relief as this Court

deems just and proper.

## II. JURISDICTION

6.  This action arises under the laws of the United States and involves the

United States as a Defendant. Therefore, this Court has subject matter

jurisdiction over the claims specified in this Complaint pursuant to 28

U.S.C. §§ 1331, 1346.

7.  An actual controversy exists between Plaintiffs and Defendants.  Plaintiffs'

members use and enjoy the Helena-Lewis and Clark National Forest for

hiking, fishing, hunting, camping, photographing scenery and wildlife, and

engaging in other vocational, scientific, spiritual, and recreational activities.

Plaintiffs' members intend to continue to use and enjoy the area frequently

and on an ongoing basis in the future.

8.  The aesthetic, recreational, scientific, spiritual, and educational interests of

Plaintiffs' members have been and will be adversely affected and

irreparably injured if Defendants implement the Project.  These are actual,

concrete injuries caused by Defendants' failure to comply with mandatory

duties under ESA, NFMA, NEPA, and the APA. The requested relief would

redress these injuries and this Court has the authority to grant Plaintiffs'
requested relief under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 &
706.

9.   Plaintiffs submitted timely written comments and objections concerning the
Project and Forest Plan amendment in the available administrative review
process, thus they have exhausted administrative remedies.  Therefore, the
Court has jurisdiction to review Plaintiffs' APA claims.

10.  Plaintiffs submitted a 60 Day Notice of Intent to Sue under the ESA to
Defendants over 60 days prior to filing this complaint.  Thus, this Court has
jurisdiction over Plaintiffs' ESA claims.

## III. VENUE

11.  Venue in this case is proper under 28 U.S.C. § 1391(e) and LR 3.3(a)(1).
Defendant Marten resides within the Missoula Division of the United States
District Court for the District of Montana.

## IV. PARTIES

12.  Plaintiff NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana
corporation with its principal place of business in Three Forks, Montana.
Native Ecosystems Council is dedicated to the conservation of natural
resources on public lands in the Northern Rockies.  Its members use and
will continue to use the Helena-Lewis and Clark National Forest for work

and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing.  The Forest Service's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the Helena-Lewis and Clark National Forest, including the Project area.  Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

13.   Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems.  Its registered office is located in Missoula, Montana. The Alliance has over 2,000 individual members, many of whom are located in Montana.  Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area in the Helena-Lewis and Clark National Forest.  Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems as set forth below.  Alliance for the Wild Rockies brings this action on its own

behalf and on behalf of its adversely affected members.

14. Defendant LEANNE MARTEN is the Regional Forester for the Northern Region/Region One of the U.S. Forest Service, and in that capacity is charged with ultimate responsibility for ensuring that decisions made at each National Forest in the Northern Region, including the Helena-Lewis and Clark National Forest, are consistent with applicable laws, regulations, and official policies and procedures.

15. Defendant UNITED STATES FOREST SERVICE (Forest Service) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the Helena-Lewis and Clark National Forest.

16. Defendant UNITED STATES FISH AND WILDLIFE SERVICE (FWS) is an administrative agency within the U.S. Department of Interior, and is responsible for the lawful management of species listed under the Endangered Species Act.

## V.  FACTUAL ALLEGATIONS

17.  The Forest Service issued a final EIS for the Project on August 24, 2015, and issued a Record of Decision authorizing the Project and Forest Plan Amendment #31 on August 25, 2016.

18. The Forest Service produced a Biological Assessment for the Project on

August 8, 2016.

19.     The Forest Service received a Biological Opinion for the Project from FWS

        on August 24, 2016.

20.     Plaintiffs filed a complaint against the Project and Forest Plan amendment

        on February 17, 2017.

21.     On May 30, 2017, this Court issued a preliminary injunction against the

        Project.

22.     On July 17, 2017, a wildfire, later named the Park Creek fire, started in the

        northern portion of the Project area, and the litigation was subsequently

        stayed.

23.     On January 19, 2018, the Forest Service filed a motion for a voluntary

        remand without vacatur in order to conduct supplemental environmental

        analysis for the Project.

24.     On June 12, 2018, this Court granted in part and denied in part the Forest

        Service's motion:  the Court granted the remand, but denied the request to

        remand without vacatur; the decision authorizing the Project and Forest

        Plan amendment was vacated.

25.     In August 2019, the Forest Service produced a final Supplemental EIS for

        the Project and Forest Plan amendment.

26.     On December 19, 2019, the Forest Service issued a Record of Decision

authorizing the Project and Forest Plan amendment, which is now referred

to as "Amendment #35."  The Forest Service authorized "Alternative 4"

from the Supplemental EIS, with the exceptions of units 46aa and 46ab and

maintenance on Forest Service Road 607-C1.  Alternative 4 consists of the

remaining units within the Stonewall Project boundary that were not

affected by the Park Creek fire.

27.     The July 29, 2019 species list for the Helena National Forest includes

grizzly bear (threatened), lynx (threatened), lynx critical habitat, bull trout

(threatened), bull trout critical habitat, and wolverine (proposed).

28.     The Forest Service did not reinitiate ESA consultation for the Project for

grizzly bear, lynx, lynx critical habitat, bull trout, or bull trout critical

habitat.

29.     Forest Plan Amendment #35 exempts the Project from complying with

multiple Forest Plan standards that limit logging and road density in elk

habitat, including (1) Forest-wide Big Game Standard 3, which requires

retention of hiding cover on elk summer range, (2) Forest-wide Big Game

Standard 3, which requires retention of thermal cover on elk winter range,

(3) Forest-wide Big Game Standard 4a, which limits open road densities in

elk habitat during the big game hunting season depending on the amount of

elk hiding cover available, and (4) Management Area T-2 standard, which

requires retention of thermal cover on elk winter range.

STONEWALL PROJECT AREA & ACTIVITIES

30.   The Project area is on the Lincoln Ranger District of the Helena National
      Forest, approximately four miles north and west of the town of Lincoln,
      Montana.

31.   The Project area covers approximately 24,010 acres (approximately 23,670
      acres are National Forest System lands) within Lewis and Clark and Powell
      Counties, Montana.

32.   The Project authorizes management activities on 1,381 acres, including
      logging on 1,112 acres, prescribed burning on 269 acres, 0.9 miles of
      temporary road building, and road maintenance or reconstruction on 25
      miles of roads.

33.   The Forest Service estimates that logging will occur over five years, and
      burning and hand thinning would occur over 10 years.

34.   The Project is economically inefficient when all activities are considered.

PARK CREEK FIRE

35.   When the Project was originally proposed, the Forest Service represented
      that the Project area needed large-scale logging and burning to avoid
      "catastrophic" wildfire.

36.   However, a wildfire did start in the Project area prior to implementation of

the Project, and the results were dramatically different than the Forest

Service's dire predictions.

37.    As shown in the map below, in terms of soil burn severity, the vast majority

of the area within the Park Creek fire perimeter – 70% –  was unburned or

burned with very low or low severity (light gray and green).  Only a very

small portion of the area – 8% – burned at high severity (black).



38.    In terms of vegetation, the Forest Service states that "[t]he mixed severity of

the fire resulted in a mosaic of conditions on the landscape where the fire

burned, similar to the effects of the planned prescribed burns in the 2016

project decision. These conditions include the creation of openings, the reduction of ladder fuels and ground fuels, and unburned areas in between []."

39.    More specifically, only 19% of the Project area experienced high vegetation mortality, while the majority of the Project area was unburned or experienced low vegetation mortality.

40.    The Forest Service never squares its dire predictions of "catastrophic" wildfire with the actual results of the Park Creek fire – a mixed severity fire that burned in a natural mosaic pattern with the majority of the area unburned or burning at low severity with low mortality.

41.    Instead of addressing these facts and their implications with integrity, in the Supplemental EIS, the Forest Service reprints the statement of a timber industry group opining that "needed treatments [were] held up in court and subsequently impacted by a catastrophic wildfire."  Instead of correcting this misstatement, the Forest Service simply states: "Thank you for your comments."

GRIZZLY BEAR

42.    The grizzly bear is listed as a threatened species under the Endangered Species Act.

43.    Grizzly bears are present on the Helena National Forest.

44.    The Project area is located in the southern portion of the Northern

       Continental Divide Ecosystem (NCDE) Grizzly Bear Recovery Zone.

45.    Resident and/or traveling grizzly bears may be present throughout the entire

       Project area.

46.    The Montana Department of Fish, Wildlife, and Parks (FWP)  has informed

       the Forest Service that the "Blackfoot Travel Plan area," which includes the

       Project area, "is exceedingly important to recovering grizzly bear

       populations in the southern NCDE."

47.    The Project area is within the Landers Fork Bear Management Unit (BMU)

       and includes portions of the Arrastra and Red Mountain BMU sub-units.

48.    The 2019 Project ROD restricts all Project activities to the Arrastra subunit.

49.    The original BA and BiOp/concurrence for the Project were prepared in

       2016.

50.    Subsequently, in 2018, the Forest Service amended its Forest Plan to add

       new management direction for grizzly bears, and remove some of the

       existing management direction for grizzly bears.  FWS provided a new

       Biological Opinion and Incidental Take Statement for this Forest Plan

       amendment for grizzly bears ("programmatic grizzly BiOp").

51.    The programmatic grizzly BiOp mandates several new requirements that

       were not in effect, and therefore not addressed, in the original 2016 Project

ESA consultation.

52.     The programmatic grizzly BiOp mandates:  "Concurrent, temporary increases in OMRD or TMRD, or concurrent temporary decreases in secure core for projects (as defined in the glossary for the NCDE) on NFS lands shall not occur in more than 3 adjacent grizzly bear management subunits on each National Forest."  There is no analysis of this requirement in the original Project ESA consultation.

53.     The programmatic grizzly BiOp mandates:  "If on-the-ground project implementation exceeds five years out within a grizzly bear subunit . . . the level of take exempted under this biological opinion would be exceeded." There is no analysis of this requirement in the original Project consultation, and the Project may take up to 10 years to complete.

54.     The programmatic grizzly BiOp mandates: "[t]emporary increases in open and total motorized route densities and temporary decreases in secure core would be allowed for projects (see "project" definition in the glossary). However, temporary deviations from baseline conditions will not exceed a five percent increase for OMRD, a three percent increase for TMRD, and a two percent decrease for security core. *Temporary deviations will be calculated using a ten-year running average for each bear management subunit* (procedures for this calculation are presented in Appendix 2; see

NCDE-STD-AR-03 for details)." There is no analysis of this requirement in

the original Project consultation.

55.   The programmatic grizzly BiOp states: "The existing condition in the

Arrastra Mountain subunit currently exceeds the recommended level for

TMRD at 21 percent, but will meet the recommended level after full

implementation of the Blackfoot travel plan (TMRD will decrease to 17

percent)."

56.   The Forest Service did not reinitiate ESA consultation on grizzly bears to

provide a second-tier consultation for the Project that acknowledges and

confirms that the Project complies with the requirements of the 2018

programmatic BiOp.

57.   The original Project consultation does not disclose the fact that the Arrastra

subunit currently violates the 19% TMRD limit, but instead represents that

the opposite is true.

58.   The Supplemental EIS for the Project makes the same false representation:

"The biological assessment (USDA Forest Service 2016a, page 42)

concludes that the Arrastra subunit meets the 19/19/68 guidelines for open

motorized route density, total motorized route density and security core

habitat under the existing condition, during implementation, and

post-project."

59.   Additionally, the 2019 ROD continues to make this false representation: "The Arrastra Mountain subunit meets the 19/19/68 guidelines for open motorized route density, total motorized route density, and Core area before, after and during project implementation."

60.   A road can only be deducted from TMRD if it is decommissioned.

61.   The Blackfoot Travel Plan committed the Forest Service to decommissioning 213 miles of roads.

62.   As of June 29, 2020, the Forest Service has only actively decommissioned 65 miles of roads, while the agency represents that an additional 30 miles have been "naturally reclaimed."

63.   Thus, at most, the Forest Service has only decommissioned 95 miles (45%) of the 213 miles it promised to decommission in its 2016 analysis.

64.   Furthermore, as of June 29, 2020, the Forest Service indicates that no decommissioning has occurred in the Arrastra subunit at all. In other words, as of June 29, 2020, the Arrastra subunit still has 21% TMRD.

65.   The Project will temporarily further degrade the condition in the Arrastra subunit during Project implementation by allowing construction and use of 0.9 miles temporary roads, which increases total motorized route density.

66.   The Forest Service admits that "some displacement of bears is expected while treatments are being implemented" for the Project.

67.  The Forest Service admits that "in the short term there will be a reduction in cover and forage, increased potential for displacement of bears and an increased risk of bear/human conflicts" caused by Project implementation.

68.  The Project is likely to adversely affect grizzly bears.

LYNX

69.  The Canada lynx is listed as a threatened species under the Endangered Species Act.

70.  Lynx are present on the Helena National Forest.

71.  The Project area is within lynx Critical Habitat Unit 3.

72.  The entire Project area is within designated occupied and core lynx habitat as well as lynx critical habitat.

73.  The Project area is fully contained within two Lynx Analysis Units: BL-07 and BL-08.

74.  BL-07 is 26,662 acres and has a road density of 2.8 miles/square mile.

75.  BL-08 is 27,549 acres and has a road density of 1.9 miles/square mile.

76.  The Project allows logging on 910 acres within BL-07 and 83 acres within BL-08.

77.  The Project allows burning on 48 acres within BL-07.

78.  The Forest Service represents that the Project will regenerate, i.e. clearcut, 327 acres in BL-07.

79.   The Forest Service represents that the Project will remove 319 acres of
      stand initiation structural stage that currently provides snowshoe hare
      habitat in BL-07.

80.   The Forest Service represents that the Project will remove 120 acres of
      multi-storied structural stage that currently provides winter snowshoe hare
      habitat in BL-07 and will remove 81 acres of multi-storied structural stage
      that currently provides winter snowshoe hare habitat in BL-08.

81.   The existing condition in the BL-07 and BL-08 changed as a result of the
      Park Creek wildfire.

82.   At the time of the original 2016 Project analysis, BL-07 had 2.4% early
      stand initiation (420 acres) and 47.6% multi-storied mature forest (8,401
      acres).

83.   At the time of the original 2016 Project analysis, BL-08 had 45.7% early
      stand initiation (9,787 acres) and 13.8% multi-storied mature forest (2,953
      acres).

84.   At the time of the original Project analysis, the Forest Service anticipated
      that Project implementation would result in 9.2% early stand initiation
      (1,630 acres) and 45.8% multi-storied mature forest (8,068 acres) in BL-07.

85.   At the time of the original Project analysis, the Forest Service anticipated
      that Project implementation would result in 46.4% early stand initiation

(9,941 acres) and 13.1% multi-storied mature forest (2,806 acres) in BL-08.

86.    The existing condition now in BL-07 is 20.6 % in early stand initiation

(3,628 acres) and 37.4 % in multi-storied mature forest (6,595 acres).

87.    The existing condition now in BL-08 is 67.5 % in early stand initiation

(14,456 acres) and 7.4 % in multi-storied mature forest (1,576 acres).

88.    Post-Project, BL-07 will have 24.8 % in early stand initiation (4,365 acres)

and 36.7 % in multi-storied mature forest (6,475 acres).

89.    Post Project, BL-08 will have 67.5 % in early stand initiation (14,456 acres)

and 7.0 % in multi-storied mature forest (1,495 acres).

90.    The numbers discussed above are set forth in the table below:

|  | 2016 Existing Condition | 2016 Anticipated Project Effects | Current Existing Condition | Current Anticipated Project Effects |
|---|---|---|---|---|
| BL-07 early stand initiation | 2.4% | 9.2% | 20.6 % | 24.8 % |
| BL-07 multi-story mature | 47.6% | 45.8% | 37.4 % | 36.7 % |
| BL-08 early stand initiation | 45.7% | 46.4% | 67.5 % | 67.5 % |
| BL-08 multi-story mature | 13.8% | 13.1% | 7.4 % | 7.0 % |

91.  The Kosterman Thesis found that "the percentage of young regenerating

forest had a strong positive linear appearance until the composition reached

approximately 10-15% of the core area. Above this level of composition, the

probability of producing a litter declined (Figure 3). . . . home ranges with

greater proportions of young forest (i.e. >15%) may compromise foraging

habitat for lynx in the winter."

92.  The Kosterman Thesis found: "Current management of US Forest Service

lands that contain lynx habitat allows for no greater than 30% young forest

within a predefined lynx analysis unit (Ruediger et al. 2000, USFS 2007).

*We suggest 10-15% composition of young regenerating forest may be more*

*appropriate, and suggest that lesser amounts (<10%) and greater amounts*

*(>15%) may negatively affect lynx reproductive output*."

93.  As noted above, the BA and BiOp for the Project were prepared in 2016.

94.  Subsequently, in October 2017, FWS issued a programmatic Biological

Opinion (programmatic lynx BiOp) for the impact of the Northern Rockies

Lynx Management Direction on lynx critical habitat.

95.  The programmatic lynx BiOp states: "This consultation represents the first

tier of a tiered consultation framework, with each subsequent project that

may affect lynx critical habitat as implemented under the NRLMD being the

second tier of consultation. These second tier consultations would reference

back to this biological opinion to ensure that the effects of specific projects

under consultation are commensurate with the effects anticipated in this

biological opinion."

96.     The programmatic lynx BiOp further mandates: "Projects that occur within

matrix habitat must still be analyzed for potential effects to matrix habitat.

As for all critical habitat, including matrix habitat, the Forest Service may

use the guidance in the Service's 2014 critical habitat designation (79 FR

54782) to assess and/or reduce or avoid negative effects on critical habitat."

97.     In particular, the matrix analysis must analyze whether "activities create a

barrier or impede lynx movement between patches of foraging habitat and

between foraging and denning habitat or if they adversely affect adjacent

foraging and denning habitat."

98.     The programmatic lynx BiOp also mandates: "Future site-specific

consultations on projects will provide both the amount of PCE 1a within the

action area LAU(s) and the amount of PCE 1a affected by the action, thus,

analyzing the specific amount of PCE 1a that will be affected."

99.     Regarding the effects of the Project on lynx, the agencies did not reinitiate

ESA consultation on the Project to analyze the effects on lynx in light of the

new post-wildfire baseline.

100.    Regarding lynx critical habitat, the Forest Service did not prepare a

second-tier consultation for this Project that (a) "reference[s] back to [the 2017 programmatic lynx] biological opinion to ensure that the effects of specific projects under consultation are commensurate with the effects anticipated in [the 2017 programmatic lynx] biological opinion," (b) addresses whether the Project will impact matrix habitat located between foraging/denning habitat patches, which requires a map of these areas overlaid with a map of Project units, or (c) discloses the post-fire baseline amount of PCE1a within the Project area, as well as the amount affected by the Project, or (d) provides the updated baseline post-Park Creek fire in general and conducts an analysis of impacts to critical habitat based on that new baseline.

101.  The Project is likely to adversely affect lynx and lynx critical habitat.

BULL TROUT & BULL TROUT CRITICAL HABITAT

102.  The original 2016 Project consultation found that "[r]oad use, construction, and maintenance activities from the Stonewall Project would produce a short-term increase in sediment delivery that results in a minor 'degrade' to the sediment indicator in the Beaver Creek and Keep Cool Creek HUCs (Table 4)."

103.  The original 2016 Project consultation found: "The Stonewall Project would occur in an area of degraded baseline conditions.  Baseline conditions for

sediment, substrate embeddedness, and the integrated primary habitat indicator are rated [Functioning at Unacceptable Risk "FUR"] in four of the five HUCs of the Stonewall Project action area."

104.  The original 2016 Project consultation found:  "The greatest potential effects to bull trout from the Stonewall Project are due to increased sediment delivery to streams from use of the existing road system . . . .."

105.  Thus, FWS found: "additional sediment resulting from the Stonewall Project will result in a low level of injury or mortality to individual bull trout that is additive to the existing effects from baseline conditions."

106.  After the Park Creek fire, the Forest Service acknowledged: "Fire suppression, post-fire suppression rehabilitation and Burned Area Emergency Response activities likely led to short-term increases in sediment delivery to streams from roads."

107.  Additionally, "[p]eak flows and sediment delivery to streams in burned drainages . . . are expected to increase in frequency and magnitude, primarily in short-term localized pulses for the first several years following the fire."

108.  In the 2019 ROD, the Forest Service discloses that "other roads that will not be addressed in this project have sediment delivery sites that will continue the ongoing and historic anthropogenic sediment delivery to streams.  Such

adverse effects have not undergone consultation . . . ."

109.   Although the adverse effects from "other roads" in the Project area have not undergone consultation, and although the Park Creek fire creates a new, more-degraded baseline and new reasonably foreseeable sedimentation and temperature effects for bull trout and bull trout critical habitat in the Project area, the agencies did not reinitiate ESA consultation on the Project.

110.   The Project is likely to adversely affect bull trout and bull trout critical habitat.

ELK

111.   Elk are a management indicator species on the Helena National Forest.

112.   The Project area is in Hunting District 281.

113.   Two elk herds use the Project area: Keep Cool Elk Herd and Beaver Creek Elk Herd.

114.   The existing condition for both Elk Herd Units (EHUs) fail to comply with Forest Plan Standard 3 in terms of hiding cover.

115.   Both EHUs also fail to comply with Forest Plan Standard 3 in terms of thermal cover.

116.   Both EHUs also fail to comply with Forest Plan Standard 4a, which requires a combination of a minimal amount of hiding cover and a maximum open road density.

117.  Although neither EHU complies with the Forest Plan, the Project would allow the removal of 2,055 acres of hiding cover in the Beaver Creek EHU and 49 acres of hiding cover in the Keep Cool EHU.

118.  In the Beaver Creek EHU, the Project will reduce hiding cover from 42% to 36%, and in the Keep Cool EHU, the Project will reduce hiding cover from 23% to 22%.

119.  The Project will move these elk herd units further away from consistency with Forest Plan Standard 3 and 4a.

120.  Current open road density in the Beaver Creek EHU during hunting season is 1.4 miles/square mile.

121.  Current road density in the Keep Cool EHU during hunting season is 1.3 miles/square mile.

122.  The Project will allow the construction of approximately 0.9 miles of temporary road in the Beaver Creek EHU.

123.  The Project will allow the reopening of an additional 9.6 miles of currently closed roads to serve as log-hauling routes in the Beaver Creek EHU.

124.  Open road density during Project implementation in the Beaver Creek EHU during hunting season would increase to 1.7 miles/square mile.

125.  The Project does not meet Forest Plan Standard 3 for Hiding Cover, Forest Plan Standard 3 for Thermal Cover, Forest Plan Standard 4a for open road

density and hiding cover, the 50 percent recommendation (Christensen et al 1993) for Habitat Effectiveness, or the 30 percent recommendation (Hillis et al 1991) for Security Habitat.

126.   Despite the failing condition of the Project area, the EIS represents: "Conclusions and Determination . . . Hunting opportunities would be maintained and based on the analysis presented above and the following rationale, adequate elk habitat would continue to be available within both units to support desired levels of elk."

127.   The 2019 ROD continues to represent: "Hunting opportunities will be maintained and adequate elk habitat will continue to be available to support desired levels of elk."

128.   The EIS further states: "elk security and walk-in hunting opportunity objectives identified for this EMU (MFWP 2005) would be maintained."

129.   The EIS further states:  "Elk habitat would continue to be abundant and well-distributed and species' viability would be maintained across the Forest."

130.   The 2019 ROD continues to represent: "elk habitat should remain abundant and well distributed across the Forest. It is anticipated that the Forest will retain habitat components necessary to maintain a viable and huntable elk population."

131.   The EIS further represents: "Of the primary [Montana Fish, Wildlife, and
Parks] population parameters likely to be impacted by elk security habitat
on the Helena National Forest (namely, total population numbers and
bull/cow ratios), total numbers on average have met Montana Elk Plan
objectives for the past several years. The project would make no changes
that would influence this."

132.   The EIS further represents:  "[w]hile many factors contribute to elk
numbers, exempting the project from Standards 3 and 4a, and hiding cover
and thermal cover standards for management areas T-2 and T-3, should not
preclude the ability of Montana Department of Fish, Wildlife, and Parks to
realize its elk objectives in this hunting district."

133.   The 2019 ROD continues to represent: "elk populations - and their viability
- are more likely to be controlled by harvest than by limits in cover [].
Furthermore, implementation of this project, and others for which a Forest
Plan amendment has been or could be applied, should not impede the ability
of the Forest to maintain and/or improve big game security while providing
for an extended hunting season – the intent of Standard 4(a). The metrics
used by Montana Department of Fish, Wildlife, and Parks to determine if
elk objectives are being met indicate that for the most part the hunting
districts that overlap with the Forest are at or above Montana Fish, Wildlife

and Parks objectives."

134.  Forest Plan Standard 6 mandates that "Montana Cooperative Elk-Logging
      Study Recommendations, in [Forest Plan] Appendix C, will be followed
      during timber sale and road construction projects."

135.  In its "Road Management Recommendation," the Montana Cooperative Elk-
      Logging Study states: "Where maintenance of elk habitat quality and
      security is an important consideration, open road densities should be held to
      a low level and every open road should be carefully evaluated to determine
      the possible consequences for elk."

136.  In the Project EIS, the Forest Service argues that it is complying with this
      "Road Management Recommendation" from the Montana Cooperative Elk-
      Logging Study:  "Road management – This recommendation is also
      intended to maintain elk security through management of road densities.
      Implementation of Alternatives 2 and 3 would result in a short-term (5 years
      or less) increase in road density during implementation. New roads would
      not be opened to the public. Elk security would be maintained over the
      long-term and both alternatives are consistent with this recommendation."

137.  In its response to the administrative objection to the Project and Forest Plan
      Amendment, the Forest Service Regional Office stated that the "best
      available science for big game security" is the "Blackfoot methodology" as

set forth in the "proposed programmatic forest plan standard defined in the Blackfoot non-Winter Travel Plan EIS."

138. The Blackfoot methodology applies the Hillis elk security concept, with modifications so that a 50% minimum of elk security is required, and the percentage is calculated with a denominator equivalent to the proportion of an Elk Herd Unit within the boundary of the Lincoln Ranger District. Additionally, security blocks must be at least 1,000 acres in size and at least 0.5 miles from a motorized route open to the public between September 1 and December 1 (archery and rifle hunting season), and blocks do not include any constrictions less than ½ mile in width.

139. The Hillis elk security concept was modified for the Blackfoot area because, as FWP has explained, "[a]lthough the [Hillis] authors recommended that, on their study area, secure patches be a minimum of 250 acres in size and comprise at least 30% of a herd unit's fall home range, they were clear that where forests are more sparse and where terrain is less formidable (as in the [Lincoln Ranger District]), the size of security areas must be significantly larger in order to provide similar security to resident elk."

140. FWP further informed the Forest Service that "security area patch size (250 acres) and percent retention (30% of an elk analysis unit)" in the Lincoln Ranger District is not "supported by either the literature or the [Helena

National Forest]'s own analysis."

141.  The revised version of the Project EIS, issued in August 2015, indicates that
under the Blackfoot methodology, the Project area has only 41% elk
security in the Beaver Creek Elk Analysis Unit and 36% elk security in the
Keep Cool Elk Analysis Unit, which both fail the 50% recommendation.

FWP FINDINGS - ELK SECURITY ON THE LINCOLN RANGER DISTRICT

142.  In its May 27, 2014 objection to the proposed Blackfoot Travel Plan and
Travel Plan Forest Plan Amendment, FWP stated: "MFWP's mission is
broad, but our objection (in this letter) is centered on a specific value for
which Montana relies on the [Helena National Forest]: the continued
provision of elk (and other wildlife) hunting opportunities on public lands
for present and future generations. We further suggest that this value helps
set the [Helena National Forest] apart from many other forests in the
National Forest System, with regard to the multiple uses that we offer on
our public lands in Montana. . . . The [Helena National Forest] is a
destination for elk hunting in the US, the foundation for which is the
amount and quality of habitat, security and access afforded on our public
lands."

143.  FWP further stated:  "Recently, the [Helena National Forest] has worked in
partnership with other East-Side Forests in Montana, MFWP, and the

National Forest Northern Region Office to update elk security guidance,

reflecting the best available science and professional expertise.  However,

despite these efforts, the Big Game Security D[raft] ROD [for a Forest Plan

Amendment] coupled with the [Travel Plan] FEIS's preferred Alternative 4

would actually decrease elk security on the  [Helena National Forest]

compared to alternatives presented in the D[raft] EIS, and would

cumulatively risk elk populations and the hunting tradition on public land."

144.  FWP further stated:  "MFWP objects to the proposed decision to adopt the

big game security Forest Plan amendment alternative B (preferred

alternative). This amendment provides for and protects inadequate big game

security in several Lincoln Ranger District (LRD) Elk Analysis Units-–if it

were to be implemented in conjunction with the FEIS's Preferred Travel

Plan Alternative 4."

145.  In response to the Forest Supervisor's statement that Travel Plan Alternative

4 achieves a purpose and need to "[m]ore closely align current science, local

conditions, and other information with elk security needs that meet the

intent of the Forest Plan; [and] ensure Helena Forest Plan (USDA Forest

Service 1986, as amended) management direction applicable to big game

security is up-todate and based on the best available information," FWP

stated, "MFWP disagrees with this statement. We object to its use as a

29

rationale for adopting either the proposed new big game security standard (amendment alternative B) or the Blackfoot Travel Plan FEIS Preferred Alternative 4. . . . Adoption of Amendment B in conjunction with FEIS Alternative 4 would fail to provide or protect adequate big game security within much of the [Lincoln Ranger District]."

146.   FWP further stated: "the Big Game Security Amendment [draft] ROD, implies or cites[] that the total number of elk documented by MFWP biologists within hunting districts that include the Lincoln Ranger District lands is a correct measure of whether or not adequate secure big game habitat is available on Forest Service lands. This is inappropriate because the correct measures of big game security are annual bull survival rates and the degree to which big game are retained on public land during the fall hunting season."

147.   FWP further stated: "MFWP supports the concept that, on the [Lincoln Ranger District], providing adequately large, properly configured, well distributed, and numerous patches of non-motorized secure fall habitat within the [Lincoln Ranger District]'s Elk Analysis Units (EAUs) would ensure annual bull survival objectives are met and would reduce the likelihood of public elk leaving public lands during the fall hunting season. While it is true that MFWP biologists collaborated closely with USFS

biologists (and, in fact, provided the data, analysis, and professional opinion that formed the basis of big game security Amendment Alternative B), MFWP's recommendations were explicitly predicated and dependent upon the adoption of a Travel Plan closely aligned with FEIS Alternative 3. In some EAUs, Big Game Security Amendment alternative B will not provide or protect adequate fall big game security if the Preferred Travel Plan Alternative 4 were to be adopted."

148. In previous comments to the Forest Service, FWP had found: "Although elk populations have generally increased in hunting districts that include Helena National Forest land since adoption of the 1986 HNF Forest Plan, the number of elk that spend summer and fall on the Lincoln Ranger District (LRD) have not. . . . *Bull survival is low relative to FWP objectives in 3 of the 4 elk hunting districts that include the Lincoln Ranger District*; the one exception being hunting district (HD) 339 where special regulations specifically limit bull harvest opportunity. FWP recommends that land managers provide enough secure habitat during fall to meet annual bull survival objectives while maintaining general bull harvest opportunity. . . . *Neither public land populations nor bull ratios in the Lincoln valley have increased* despite the near elimination of antlerless harvest opportunity and the adoption of spike-bull harvest restrictions. In contrast, *the number of elk*

*that spend the majority of the year on some nearby private lands has increased dramatically* between 1986 and 2013. FWP has consistently urged the HNF to increase functional fall habitat security on the Lincoln Ranger District during the more than 5 years we have participated in the non-winter Travel Plan amendment process. Alternative 3 in the Blackfoot Non-winter Travel Plan DEIS (hereafter, Alternative 3) fairly represents FWP's recommendations."

149.  FWP also reminded the Forest Service: "FWP biologists consistently argued that fall motorized-route density was too high in certain portions of the [Lincoln Ranger District] and that specific routes and motorized-use areas *unacceptably compromised elk habitat security*."

150.  Further, FWP had informed the Forest Service that "Although total elk numbers are currently within objective in HD 281 (not 'above', as stated in the DEIS), *bull survival (a 3- year average of 9 bulls: 100 cows observed in spring) has consistently been well below the objective* of 15 bulls: 100 cows described in the Montana Final Elk Management Plan (MFWP 2004)."

151.  FWP further stated: "Within the Travel Plan FEIS and Big Game Security Amendment [draft] ROD, the analysis of overall elk population trend mischaracterizes the specific purposes of providing secure big game fall habitat. In reality, these purposes should be to: 1) increase bull elk survival,

and  2) prevent the displacement of elk from public lands during fall hunting

seasons."

152.   FWP stated: "The objective of a big game security standard is to ensure that

adequate and well-distributed secure big game habitat is retained within

[Lincoln Ranger District] EAUs. The correct measure of the standard's

adequacy is not elk population counts or trend within MFWP hunting

districts or FS Elk Analysis Units []. Instead, provision of adequate and

well-distributed secure public-land habitat is intended both to protect a

defined proportion of bulls from harvest and to prevent the displacement of

public elk from public lands during the fall hunting season."

153.   FWP explained: "In managed landscapes, open motorized route density and

arrangement during the fall hunting season most strongly affects bull

survival. Inadequate secure public land habitat may also cause elk to

increase use of nearby private lands that provide only little or no public

hunting opportunity."

154.   Thus, FWP stated that "implementation of [Travel Plan] Alternative 3

would increase bull survival on the Travel Plan area and help affected herds

achieve or maintain FWP bull-ratio objectives going forward."

155.   FWP explained: "Within the Travel Plan FEIS, the use of 'Elk Herd Unit'

and 'Elk Analysis Unit' (or just, 'Analysis Unit') are incorrectly treated as

equivalent; they are not. . . . The incorrect use of these terms in the FEIS led to mistaken conclusions in the Big Game Security Amendment [draft] ROD that proposed Amendment B would adequately provide and protect fall big game security habitat under any of the analyzed Travel Plan alternatives. MFWP worked with USFS biologists to define discrete year-round Elk Herd Unit boundaries that, in most cases, included both USFS and adjacent private lands. During later collaborative work to assist the USFS in developing an amended Big Game Security standard, MFWP recommended use of the concept of the Elk Analysis Unit, defined as 'that portion of an Elk Herd Unit within the Forest Service administrative boundary,' because we recognized that USFS planners could neither regulate nor control elk habitat management outside the National Forest administrative boundary and that private lands outside the administrative boundary are generally insecure. This is an important distinction because the authors of the 'Hillis Paradigm' (Hillis et al. 1991) stress that 'to be biologically meaningful, analysis unit boundaries should be defined . . . specifically by the local herd home range during hunting season' and should not be adjusted for land ownership. Because significant portions of several [Lincoln Ranger District] Elk Herd Units are privately managed, and likely insecure, MFWP biologists recommended that more than the minimum proportion of Elk

Analysis Units (within the administrative boundary) be managed as big game security habitat in order to meet overall elk habitat requirements.  In the DEIS Draft Big Game Security Amendment, the [Helena National Forest] proposed that 30% of an entire Elk Herd Unit be maintained as secure habitat, which followed both the Hillis Paradigm and the MFWP/USFS joint Working Group recommendations. However, the FEIS Big Game Security Amendment B measures elk security at the Elk Analysis Unit level. The USFS analysis in Appendix F (p. 174) therefore incorrectly implies that there would be an increase in the 'desired minimum threshold' or 'Goal' from 30% to 50% secure habitat because the denominator of the ratio is entirely different for each calculation. The 50% standard applied in the Preferred Alternative B refers to that portion of an Elk Herd Unit within the FS boundary, a.k.a., the Elk Analysis Unit, while the 30% threshold was tied to the entire Elk Herd Unit, as above."

156.  FWP stated: "MFWP biologists and managers worked with the [Helena National Forest] to develop Big Game Security Amendment Alternative B, to replace existing Forest Plan Standard 4(a)."

157.  FWP informed the Forest Service: "Changing the big game security standard to come into compliance is not sufficient in and of itself; the standard must adequately conserve secure habitat."

SITE-SPECIFIC PROJECT FOREST PLAN AMENDMENT

158. The Project includes a Project-specific Forest Plan amendment to exempt the Project from the following Forest Plan requirements: (1) Forest-wide Standard 3 for hiding cover on summer range and thermal cover on winter range; (2) Forest-wide Standard 4a for open road densities during the big game hunting season; and (3) Management Area T-2 standard for thermal cover on winter range.

159. As the Forest Service stated in April 2018 meeting notes: "Elk – we are putting aside 4 or 5 standards for elk. We still aren't meeting standards. The effects to elk viability don't change. What about the effects to hunting opportunity? We just need to disclose that there may be an impact to hunting opportunity."

160. No such disclosure of impact to hunting opportunity was disclosed in the Supplemental EIS for the Project.

161. In an internal document produced during the Forest Plan revision process, the Forest Service represented that as of 2018, only 23 of 42 elk herd units (55%) comply with Forest Plan Standard 3 summer range hiding cover requirements.

162. In an internal document produced during the Forest Plan revision process, the Forest Service represented that as of 2018, no elk herd units comply

with Forest Plan Standard 3 winter range thermal cover requirement.

163.  In an internal document produced during the Forest Plan revision process, the Forest Service represented that as of 2018, only 15 of 40 elk herd units (38%) comply with Forest Plan Standard 4a for elk security during the fall hunting season.

164.  Rather than reducing logging or roads, the Forest Service has instead issued a "site-specific" exemption from Forest Plan Standards 4a and/or 3 at least eight times prior to this Project's amendment: (1) Tenmile Project, (2) Telegraph Project, (3) Red Mountain Flume/Chessman Project, (4) Cabin Gulch Project, (5)  Hazardous Tree Removal Project, (6) Cave Gulch Project, (7) Jimtown Project, and (8) Miller Mountain Project.

165.  The Forest Service is also planning to exempt, or has exempted, the Hogum Wildfire Resilience Project from Forest Plan Standards 4a and/or 3.

166.  The Forest Service is also planning to exempt, or has exempted, the Boulder Baldy Project from Forest Plan Standards 4a and/or 3.

167.  The Forest Service is also planning to exempt, or has exempted, the Middlemen Project from Forest Plan Standards 4a and/or 3.

168.  Thus, the Forest Service has established a practice of exempting any project that does not comply with Standards 3 or 4a.  This practice of successive "site-specific" exemptions amounts to a de facto forest-wide Forest Plan

amendment.

169.  The Forest Service stated: "This amendment is being completed under the

requirements of the 1982 [NFMA] regulations."

170.  The 1982 NFMA regulations state:

> Fish and wildlife habitat shall be managed to maintain viable
> populations of existing native and desired non-native vertebrate
> species in the planning area. For planning purposes, a viable
> population shall be regarded as one which has the estimated
> numbers and distribution of reproductive individuals to insure
> its continued existence is well distributed in the planning area.
> In order to insure that viable populations will be maintained,
> habitat must be provided to support, at least, a minimum
> number of reproductive individuals and that habitat must be
> well distributed so that those individuals can interact with
> others in the planning area.
>
> (a) Each alternative shall establish objectives for the
> maintenance and improvement of habitat for management
> indicator species selected under paragraph (g)(1) of this
> section, to the degree consistent with overall multiple use
> objectives of the alternative. To meet this goal, management
> planning for the fish and wildlife resource shall meet the
> requirements set forth in paragraphs (a)(1) through (a)(7) of
> this section.
>
> (1) . . . On the basis of available scientific information, the
> interdisciplinary team shall estimate the effects of changes in . .
> .year-long suitability of habitat related to mobility of
> management indicator species. Where appropriate, measures to
> mitigate adverse effects shall be prescribed.
>
> (2) Planning alternatives shall be stated and evaluated in terms
> of both amount and quality of habitat and of animal population
> trends of the management indicator species.
>
> (3) Biologists from State fish and wildlife agencies and other

Federal agencies shall be consulted in order to coordinate
planning for fish and wildlife, including opportunities for the
reintroduction of extirpated species.

(4) Access and dispersal problems of hunting, fishing, and
other visitor uses shall be considered.

. . . .

## VII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

The agencies' failure to reinitiate ESA consultation for the Project

for grizzly bears violates the ESA.

171.  All previous paragraphs are incorporated by reference.

172.  Reinitiation of ESA consultation is required for grizzly bears because either
"new information reveals effects of the action that may affect [grizzly bears]
in a manner or to an extent not previously considered" and/or because the
Project has been "subsequently modified in a manner that causes an effect to
[grizzly bears] that was not considered in the biological opinion or written
concurrence." 50 C.F.R. §402.16.

173.  The original BA and BiOp/concurrence for the Project were prepared in
2016.  Subsequently, in 2018, the Forest Service amended its Forest Plan to
add new management direction for grizzly bears, and remove the primary
existing management direction for grizzly bears, and a programmatic BiOp
was issued for these changes. The complete change in management

direction for grizzly bears is new information that changes the effects of the Project. Now that the Forest Plan has changed, the effects of the new management direction, as applied to this Project area, must be addressed in a site-specific Project consultation.

174. For example, the 2016 consultation for this Project fails to address the following 2018 requirements: (1) whether concurrent, temporary increases in OMRD or TMRD, or concurrent temporary decreases in secure core for projects occur in more than 3 adjacent grizzly bear management subunits; (2) whether on-the-ground project implementation exceeds five years within a grizzly bear subunit; (3) whether temporary deviations from baseline conditions – calculated using a ten-year running average – will exceed a five percent increase for OMRD, a three percent increase for TMRD, or a two percent decrease for security core. None of these requirements are analyzed in the 2016 Project consultation.

175. Additionally, there is new information regarding road density in the Arrastra subunit. While the 2016 Project consultation assumed that the Travel Plan had been fully implemented in the Arrastra subunit, thereby bringing TMRD down to 17%, the programmatic BiOp on the grizzly bear forest plan amendment discloses that the existing condition of TMRD is actually 21% and the Forest Service has disclosed that as of June 2020, no roads have

been decommissioned in the Arrastra subunit.  In other words, the baseline road density used by the agencies in the 2016 Project consultation to analyze impacts to grizzly bears was wrong, and therefore the resulting conclusions were arbitrary and capricious.  The agency's continued reliance on this false information is also arbitrary and capricious.

176.  For these reasons, the agencies' failure to reinitiate ESA consultation for grizzly bears for the Project violates the ESA.

SECOND CLAIM FOR RELIEF

The agencies' failure to reinitiate ESA consultation for the Project

for lynx and lynx critical habitat violates the ESA.

177.  All previous paragraphs are incorporated by reference.

178.  Reinitiation of ESA consultation is required because either "new information reveals effects of the action that may affect [lynx &/or critical habitat] in a manner or to an extent not previously considered" and/or because the Project has been "subsequently modified in a manner that causes an effect to [lynx &/or critical habitat] that was not considered in the biological opinion or written concurrence." 50 C.F.R. §402.16.

179.  **Lynx.**  The original BA and BiOp/concurrence for the Project were prepared in 2016. The Park Creek fire burned through the Project area in 2017 and significantly changed the baseline for lynx.  Before the fire, the

41

Project would have resulted in early stand initiation in BL-07 of 6%; after the fire, the Project will result in early stand initiation in BL-07 of 25%. These different numbers result in a different effect on lynx. The best available science, which must be applied in an ESA consultation, indicates that lynx reproduction declines once regeneration is above 15%. Therefore, because the 15% threshold was not exceeded pre-fire, but will be exceeded post-fire, there is a biologically significant new effect on lynx from this Project. This effect was not addressed in the original Project BA. It must be addressed during reinitiation of consultation on the Project.

180. **Critical Habitat.** The original BA and BiOp/concurrence for the Project were prepared in 2016. Subsequently, in October 2017, the U.S. Fish and Wildlife Service issued a programmatic Biological Opinion for the impact of the Northern Rockies Lynx Management Direction on lynx critical habitat.  Reinitiation of consultation is required for the Project for lynx critical habitat to (1) prepare a second-tier consultation to "reference back to [the programmatic] biological opinion to ensure that the effects of specific projects under consultation are commensurate with the effects anticipated in [the programmatic] biological opinion," (2) address whether the Project will impact matrix habitat located between foraging/denning habitat patches, which requires a map of these areas overlaid with a map of Project units, (3)

disclose the baseline amount of PCE1a within the Project area, as well as
the amount affected by the Project, and (4) provide the updated baseline
post-Park Creek fire and conduct an analysis of impacts to critical habitat
based on that new baseline.

181.   For these reasons, the agencies' failure to reinitiate ESA consultation for
lynx and lynx critical habitat for the Project violates the ESA.

THIRD CLAIM FOR RELIEF

The agencies' failure to reinitiate ESA consultation for the Project

for bull trout/bull trout critical habitat violates the ESA.

182.   All previous paragraphs are incorporated by reference.

183.   Reinitiation of ESA consultation is required for bull trout & critical habitat
because either "new information reveals effects of the action that may affect
[bull trout & critical habitat] in a manner or to an extent not previously
considered" and/or because the Project has been "subsequently modified in
a manner that causes an effect to [bull trout & critical habitat] that was not
considered in the biological opinion or written concurrence." 50 C.F.R.
§402.16.

184.   Post-fire conditions in the Project area will result in a degraded baseline for
bull trout and bull trout critical habitat due to increased stream
sedimentation and higher water temperatures from cover removal.  When

the impacts of the Project are added to this newly degraded baseline and new reasonably foreseeable sedimentation effects from the fire, the impacts to bull trout and critical habitat from this Project will be different than those effects previously analyzed in the 2016 BA. These new effects must be addressed in a reinitiated ESA consultation for the Project for bull trout and bull trout critical habitat.

185. For these reasons, the agencies' failure to reinitiate ESA consultation for bull trout and bull trout critical habitat for the Project violates the ESA.

FOURTH CLAIM FOR RELIEF

The Project and Project EIS analysis of elk and elk habitat

violate NEPA, NFMA, and APA.

186. All previous paragraphs are incorporated by reference.

187. The Forest Service's conclusion in the Project EIS that it is conserving adequate and "well-distributed" habitat for elk that will maintain hunting opportunities is arbitrary and capricious.

188. The facts demonstrate that the Project area fails every quantitative metric used to determine whether elk habitat is well-distributed and adequate for hunting opportunities: (1) Forest Plan Standard 3 - Hiding Cover, (2) Forest Plan Standard 3 - Thermal Cover, (3) Forest Plan Standard 4a - Open Road Density & Hiding Cover, (4) Habitat Effectiveness, (5) Hillis Elk Security at

Elk Herd Unit level (i.e., including all lands), and (6) Hillis-derived Elk

Security at Elk Analysis Unit level (i.e., lands within National Forest

boundary).

189.   In violation of NEPA, the EIS misrepresents or fails to accurately disclose

the findings of FWP regarding elk security and elk objectives on the

Lincoln Ranger District, as well as the best available science regarding

displacement of elk from degraded public lands onto private lands and the

resulting impacts to hunting opportunities.

190.   For example, the EIS misrepresents the status of the most important elk

objective in Hunting District 281 - bull/cow ratio. The EIS represents that

on average, the objective for bull/cow ratio in HD 281 has been met for the

past several years.  To the contrary, FWP has informed the Forest Service

that the bull/cow ratio for HD 281 is "consistently well below the

objective."

191.   Additionally, the EIS incorrectly implies or represents that elk population

numbers are appropriate indicators for the adequacy of elk habitat.  FWP

has informed the Forest Service that total number of elk is not a correct

measure of whether or not adequate secure big game habitat is available on

Forest Service lands: "This is inappropriate because the correct measures of

big game security are annual bull survival rates and the degree to which big

45

game are retained on public land during the fall hunting season."

192.    Furthermore, the EIS does not adequately disclose or address the displacement of elk from public land to private land during hunting season due to inadequate security habitat on National Forests.  FWP has informed the Forest Service that "[a]lthough elk populations have generally increased in hunting districts that include Helena National Forest land since adoption of the 1986 [Helena National Forest] Forest Plan, the number of elk that spend summer and fall on the Lincoln Ranger District (LRD) have not. . . . FWP recommends that land managers provide enough secure habitat during fall to meet annual bull survival objectives while maintaining general bull harvest opportunity. . . . Neither public land populations nor bull ratios in the Lincoln valley have increased despite the near elimination of antlerless harvest opportunity and the adoption of spike-bull harvest restrictions.  In contrast, the number of elk that spend the majority of the year on some nearby private lands has increased dramatically between 1986 and 2013. FWP has consistently urged the [Helena National Forest] to increase functional fall habitat security on the Lincoln Ranger District . . . ."

193.    In violation of NFMA and NEPA, the Forest Service has not demonstrated compliance with the Montana Elk-Logging Study Recommendation for Road Management as required by the Forest Plan.  The Road Management

requirement states: "Where maintenance of elk habitat quality and security is an important consideration, open road densities should be held to a low level, and every open road should be carefully evaluated to determine the possible consequences for elk."

194. The Forest Service has failed to demonstrate compliance with the requirement to hold open road densities to a low level. To the contrary, the EIS demonstrates that the Project area fails every quantitative metric of what constitutes low open road density: (1) Forest Plan Standard 4a, (2) the 50% Habitat Effectiveness threshold, (3) the 30% Hillis elk security threshold for entire Elk Herd Units, and (4) the 50% Hillis-derived elk security threshold for Elk Analysis Units (i.e., the portion of an Elk Herd Unit that falls within a National Forest boundary).

195. Moreover, the Montana Elk-Logging Study states that "open road densities are low" if there is "less than 0.5 mile of road per square mile." The Project fails to meet this definition of low open road density as well.

196. For the above-stated reasons, the Project and the Project EIS violate NEPA, NFMA, and the APA.

### FIFTH CLAIM FOR RELIEF

The site-specific Forest Plan amendment and agency practice of issuing successive site-specific amendments to evade analysis of a "significant" Forest Plan

amendment violate NFMA, NEPA, and the APA.

197.   All previous paragraphs are incorporated by reference.

198.   A Record of Decision may only be issued after completion of an EIS.

199.   An EIS must include an analysis of reasonable alternatives.

200.   Thus, a Forest Plan amendment that is authorized in a Record of Decision
       and analyzed in an EIS must include an analysis of reasonable alternatives
       for the Forest Plan amendment.

201.   The Forest Service chose to apply the 1982 NFMA regulations to the Forest
       Plan amendment that was issued with the Project.

202.   In order to ensure viability, the 1982 regulations require that the Forest
       Service ensure that wildlife habitat is well-distributed throughout a planning
       area.

203.   The 1982 regulations require the Forest Service to assess the suitability of
       habitat for management indicators species on "the basis of available
       scientific information."

204.   The 1982 regulations require the Forest Service to state and evaluate forest
       planning alternatives "in terms of both amount and quality of habitat and of
       animal population trends of the management indicator species."

205.   The 1982 regulations require the Forest Service to consult with biologists
       from "State fish and wildlife agencies" to coordinate planning for fish and

wildlife.

206.  The 1982 regulations require the the Forest Service to consider "[a]ccess and dispersal problems of hunting . . . ."

207.  In this case, the Forest Service failed to analyze any alternatives for the Forest Plan amendment, even though it chose to document its decision in a ROD and EIS.

208.  A reasonable alternative for the Forest Plan amendment would be an alternative that complies with the 1982 planning regulation by using current science and consultation with State FWP biologists to (a) ensure well-distributed habitat for elk throughout the planning area, and (b) address access and dispersal problems during the hunting season.  This could be done by proposing an alternative habitat standard, such as Hillis elk security (either 30% of an Elk Herd Unit or 50% of an Elk Analysis Unit), in place of the existing Forest Plan Standard 4a.  Simply removing Forest Plan standards and replacing them with nothing is not reasonable and does not comply with the 1982 planning regulations or NEPA.

209.  Additionally, in this case, the Forest Service failed to analyze the cumulative effects of reasonably foreseeable site-specific Forest Plan amendments to exempt other projects from Standards 3 and/or 4a.  The analysis for the amendment only discloses past and present amendments; it

does not disclose any reasonably foreseeable amendments.  This omission

violates NEPA.  *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 896

(9th Cir. 2002).

210.  A significant forest plan amendment must "follow the same procedure as

that required for development and approval of a forest plan."  36 C.F.R.

§219.10 (f) (1982).  The required procedure is set forth in the regulations.

36 C.F.R. §219.12  (1982).

211.  A forest plan amendment may be significant if it (1) significantly alters

goals or objectives, (2) results in a non-minor change in standards or

guidelines, (3) significantly alters the long-term relationship between levels

of goods and services originally projected, or (4) affects land and resources

throughout a large portion of the planning area.  *See* Forest Service Manual

1926.51, 1926.52.

212.  In this case, the Forest Service has repeatedly issued "site-specific" Forest

Plan amendments to avoid complying with Forest Plan Standards 4a and 3.

The Forest Service has issued at least eight such exemptions prior to this

Project; this Project includes another exemption; and there are at least three

reasonably foreseeable projects that also may include this exemption.

213.  Montana FWP has indicated that there is a serious problem with elk being

displaced from insecure National Forest lands onto private land during

hunting season.  Repeatedly exempting logging and roading projects from the only quantitative limits on logging and roading on this National Forest exacerbates this elk displacement problem and (a) results in a failure to comply with Forest Plan objectives and goals to maintain elk habitat and hunter opportunity, (b) results in a major change to standards and guidelines intended to maintain elk habitat and hunter opportunity, (c)significantly limits hunter opportunity on this Forest, and (d) affects a large portion of this National Forest that is reasonably available to the public for hunting.

214.  For these reasons, the Forest Service's practice of routinely exempting projects from Standards 3 and 4a amounts to a significant change to the Forest Plan, which requires analysis under 36 C.F.R. §219.10 (f) and 36 C.F.R. §219.12.

215.  The Forest Service's failure to analyze a reasonable range of alternatives and assess the cumulative effects of reasonably foreseeable actions for the Forest Plan amendment, failure to demonstrate compliance with the 1982 planning regulation requirements, and practice of issuing successive site-specific amendments to evade the analysis of what is actually a significant Forest Plan amendment violate the APA, NEPA, and NFMA.

## VIII.  RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award

51

the following relief:

A.     Declare that the implementation of the Project and/or Forest Plan

       amendment violate the law;

B.     Vacate the Project decision or enjoin implementation of the Project;

C.     Award Plaintiffs their costs, expenses, expert witness fees, and reasonable

       attorney fees under EAJA and/or the ESA; and

D.     Grant Plaintiffs any such further relief as may be just, proper, and equitable.


Respectfully submitted this 11th Day of December, 2020.


                         */s/ Rebecca K. Smith*
                         Rebecca K. Smith
                         PUBLIC INTEREST DEFENSE CENTER, PC

                         Timothy M. Bechtold
                         BECHTOLD LAW FIRM, PLLC


                         Attorneys for Plaintiffs