IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, et al., | CV 20–179–M–DWM |
| Plaintiffs, | |
| vs. | OPINION and ORDER |
| LEANNE MARTEN, et al., | |
| Defendants. | |

This case challenges decisions by the United States Fish and Wildlife Service and the United States Forest Service (collectively "Defendants") in the Helena-Lewis and Clark National Forest regarding the Stonewall Vegetation Project (the "Project") and Forest Plan Amendment #35.  (Doc. 1.)  The crux of the dispute is the Forest Service's alleged systematic use of site-specific Forest Plan amendments to avoid compliance with Forest Plan standards regarding elk. Ultimately, even if the issuance of these amendments has not negatively impacted elk populations, consistent abrogation of Forest Plan elk cover standards amounts to a "significant" change to that Plan, requiring additional environmental review.

Plaintiffs are environmental organizations that claim Defendants violated the Endangered Species Act ("ESA") by failing to reinitiate consultation for the

1

Project for the grizzly bear (Claim I)[1] and that the Forest Service violated the National Environmental Policy Act ("NEPA") and the National Forest Management Act ("NFMA") in the Project's analysis of elk (Claim IV) and use of site-specific Forest Plan amendments to avoid complying with Forest Plan standards (Claim V).  Plaintiffs further seek to supplement the administrative record with evidence of other projects where the Forest Service has used similar site-specific Plan amendments.  (Doc. 10.)  For the reasons provided below, Plaintiffs prevail on a number of their claims.

## BACKGROUND

The Stonewall Project is located in the Lincoln Ranger District of the Helena National Forest, approximately four miles northwest of the town of Lincoln, Montana.  FS_096608.[2]  The Project area covers approximately 24,010 acres (approximately 23,760 of which are National Forest System lands) within Powell and Lewis and Clark Counties.  FS_096608.  The Project authorizes management activities on 1,381 acres, including commercial logging on 706 acres, precommercial thinning on 406 acres, prescribed burning on 269 acres, 0.9 miles of temporary road building, and road maintenance or reconstruction on 25 miles of

---

[1] Plaintiffs concede that Claims II and III—which regard bull trout and lynx—have been mooted.  (Doc. 15 at 53–54.)

[2] The administrative record is cited as "FS_[Bates No.]" for Forest Service documents and "FWS_[Bates No.]" for Fish and Wildlife Service documents.

roads.  FS_096606–07, 108441.  All logging activity is anticipated to be completed within 5 years, with some Project activities lasting up to 10 years.  FS_083018, 108441.  New roads will not be open to the public, FS_084592, and open-road density will return to pre-Project levels after implementation, FS_085296.

The Forest Service initially issued a Record of Decision authorizing the Stonewall Project and Forest Plan Amendment #31 on August 25, 2016. FS_085265–473.  On February 17, 2017, Plaintiffs filed a lawsuit challenging the Project, and it was preliminarily enjoined on May 30, 2017.  *See All. for Wild Rockies v. Marten ("Marten I")*, 253 F. Supp. 3d 1108, 1110, 1115 (D. Mont. 2017).  In July 2017, a wildfire—the Park Creek Fire—started in the Project area and grew to roughly 18,000 acres.  FS_096606.  The fire burned across approximately 56 percent of the Project area.  FS_108437, 108441.  The litigation was subsequently stayed.  *See All. for Wild Rockies v. Marten ("Marten II")*, 2018 WL 2943251, at *1 (D. Mont. June 12, 2018).  On January 19, 2018, the Forest Service requested a voluntary remand without vacatur in order to conduct supplemental environmental analysis.  *Id.*  That request was granted in part and denied in part; the 2016 decision authorizing the Project and Forest Plan Amendment #31 was vacated and the matter remanded to the agency.  *Id.* at *4.

In August 2019, the Forest Service produced a final Supplemental Environmental Impact Statement ("Supplemental EIS") for the Project and Forest

Plan Amendment.  FS_096935–7098.  On December 19, 2019, the Forest Service

issued a Record of Decision (the "2019 ROD") authorizing a modified "Alternative

4" for the Project, which reflected the changed conditions in light of the fire.

FS_096601–30; *see also* FS_96938–44 (outlining changes).  As part of Alternative

4, the Forest Service proposed a site-specific, one-time amendment—Amendment

#35—exempting the Project from Forest Plan Big Game Standards 3 (elk hiding

and thermal cover) and 4a (elk hiding cover/open road densities).  FS_096608,

096617, 097004–09, 096647.  On December 11, 2020, Plaintiffs filed the present

action.  (Doc. 1.)  Argument was heard on December 7, 2021.

## LEGAL STANDARD

Actions under the ESA, NEPA, and NFMA are evaluated under the

standards set forth in the Administrative Procedure Act ("APA"), which authorizes

a court to "hold unlawful and set aside agency action, findings and conclusions

found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law" or "without observance of procedure required by law."  5

U.S.C. § 706(2)(A), (D); *see Native Ecosystems Council v. Marten*, 883 F.3d 783,

788 (9th Cir. 2018).  Agency action is arbitrary and capricious if the administrative

record demonstrates that the "agency has relied on factors which Congress has not

intended it to consider, entirely failed to consider an important aspect of the

problem, [or] offered an explanation for its decision that runs counter to the

evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Where an agency's administrative record is complete and constitutes the whole and undisputed facts underlying agency decisionmaking, summary judgment is appropriate.  *City & Cnty. of S.F. v. United States*, 130 F.3d 873, 877 (9th Cir. 1997).

## ANALYSIS

Here, Plaintiffs seek to supplement the administrative record and argue that Defendants violated their NEPA and NFMA obligations regarding elk habitat and they violated the ESA as it relates to grizzly bears.  In response, Defendants argue the present record is sufficient, Plaintiffs failed to administratively exhaust certain claims, and the agencies met their obligations.  Ultimately, Plaintiffs prevail on their elk claims insofar as the Forest Service failed to adequately consider Forest Plan Standard 6 and issued a site-specific plan amendment in violation of both NFMA and NEPA.  Plaintiffs also prevail on their ESA claim to the extent approval of the Project will result in activities in more than three adjacent grizzly bear subunits.  Remand is therefore necessary.

## I.   Motion to Supplement

Plaintiffs first seek to supplement the administrative record with, or ask the Court to take judicial notice of, documents that relate to other projects to support their claim that the Forest Service is systematically exempting projects from Forest

Plan Standards 3 and 4a in violation of NEPA and NFMA.  (Doc. 10; *see* Doc. 1 at

¶¶ 209–15.)  The following documents are at issue:

| Ex. | Description | Project | Document Date |
|---|---|---|---|
| 1 | Project area map (2 pages) | Hogum | July 9, 2020 |
| 2 | Project fact sheet (3 pages) | Hogum | January 2020 |
| 3 | Project detailed information (13 pages) | Middleman[3] | January 2020 |
| 4 | Draft Decision Notice and FONSI (77 pages) | Middleman | January 22, 2020 |
| 5 | Environmental Assessment (528 pages) | Middleman | January 2021 |
| 6 | Project information (21 pages) | Boulder Baldy | November 2020 |
| 7 | FWP comment letter (8 pages) | Middleman | September 2020 |

(Doc 11 at 9; Doc. 13 at 3.)  Plaintiffs' motion is granted in part and denied in part.

### A.    Supplementation

"Review under the APA is generally limited to the administrative record that

existed at the time the agency made its decision."  *All. for the Wild Rockies v.*

*Probert*, 412 F. Supp. 3d 1188, 1196 (D. Mont. 2019).  Nevertheless,

> [i]n limited circumstances, district courts are permitted to admit extra-record evidence: (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

*Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (internal quotation

marks omitted).  Here, Plaintiffs argue supplementation is appropriate under (1),

(3), and (4).  In response, Defendants argue that supplementation is not appropriate

---

[3] Although referred to as "Middlemen" by Plaintiffs, "Middleman" is correct.

because all seven documents post-date the 2019 ROD for the Stonewall Project and, even if they did not, do not meet the requirements of a record exception. For the reasons below, Plaintiffs are permitted to supplement the record with Exhibits 3 and 7, as well as three exhibits attached to their response brief, (*see* Doc. 22-1).

### 1.    Post-Decisional Information

"[E]xceptions to the normal rule regarding consideration of extra-record materials only apply to information available at the time, not post-decisional information." *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 600 (9th Cir. 2018) (internal quotation marks omitted). Because the documents at issue here all post-date the 2019 ROD, Defendants insist they cannot be used to supplement the record. Plaintiffs, however, argue that while the documents themselves post-date the 2019 ROD, they contain "pre-decision information." (Doc. 17 at 8.) Specifically, "Plaintiffs seek to establish that at the time of the decision in this case, there was sufficient information before the Forest Service to indicate the possibility of three reasonably foreseeable Forest Plan amendments." (*Id.*) Plaintiffs' distinction between "documents" and "information" has merit.

As argued by Plaintiffs, *Cachil* itself recognized the difference between post-decisional *documents* and post-decisional *information*. In *Cachil*, the plaintiffs relied on a declaration and study in support of their motion for summary

judgment that post-dated the decision document at issue by two years.  889 F.3d at

601.  The Ninth Circuit determined that the district court did not abuse its

discretion in striking the analysis contained in that case as post-decisional.  *Id.*

Nevertheless, the court specifically noted that it was unclear "whether the *data* pre-

dates or post-dates the Agency decision," ultimately concluding the data did not

provide a basis to make that call.  *Id.*  As a result, the court relied on *both* the fact

the declaration did not meet a record exception *and* its post hoc nature in finding it

was properly stricken.  *Id.*  Applying *Cachil* here, Plaintiffs argue that they should

be permitted to supplement the record with the pre-decisional information in the

proffered post-decisional documents.

　　As was the case in *Cachil*, it is difficult to say here what specific information

pre-dates the 2019 ROD.  While Defendants are correct that the documents

themselves all post-date December 2019, they each reflect a decisional process

with significant underlying data and information.  Complicating matters, Plaintiffs

make no attempt to identify the specific information within these documents they

seek to use.  To the contrary, Plaintiffs insist they need not do so, relying on *Lee*

*Memorial Hospital v. Burwell*, 109 F. Supp. 3d 40, 50–51 (D.D.C. 2015).  In *Lee*

*Memorial*, the defendant challenged supplementation of the record on the ground

that the plaintiffs "failed to identify the specific documents they wanted" to add.

*Id.* at 50.  The court rejected that argument, explaining that "of course" the

plaintiffs could not identify the specific file names of the specific documents at issue because only the defendant had that information. *Id.* The court further relied on the plaintiffs' "reasonably specific showing" that the agency relied on information in these extra-record documents. *Id.* at 51. *Lee Memorial* therefore relaxed the specificity requirement but reasserted the requisite connection between the proposed supplemental information and the agency decision-making process. As a result, while the post-decisional nature of the documents themselves—as opposed to the information contained therein—does not necessarily foreclose their consideration, a plaintiff must still show an extra-record exception connecting the pre-decisional information to the decision-making process.

As discussed below, Plaintiffs make a good showing that the documents regarding the Middleman Project—Exhibits 3, 4, 5, and 7—meet the extra-record exception regarding the agency's consideration of "relevant factors." Nevertheless, Exhibits 4 and 5 are dated January 2021, over a year after the 2019 ROD. (*See* Docs. 11-4, 11-5.) These are the primary decision documents for the Middleman Project and contain hundreds of pages. It is therefore difficult, if not impossible, for the Court to wade through these documents to determine what information both pre-dates and was "relevant" to the 2019 ROD. However, Plaintiffs also proffer three exhibits related to the Middleman Project—from February, July, and August 2019—that show the agency's plan to use a site-

specific Forest plan amendment.  (*See* Doc. 22-1.)  These documents are both pre-decisional and curated.  As a result, those alternative documents are considered with the record in lieu of Exhibits 4 and 5, which are excluded.

### 2.    Relevant Factors

Plaintiffs first argue supplementation is necessary here to assess "whether the agency has considered all relevant factors." *Lands Council*, 395 F.3d at 1030. As discussed in more detail below, a Forest Plan amendment must comply with NEPA procedures, *see* 36 C.F.R. § 219.10(f) (1982), and a NEPA cumulative effects analysis must address three types of actions: "past, present and reasonably foreseeable future actions," 40 C.F.R. § 1508.7 (2019).  This includes reasonably foreseeable Forest Plan amendments.  *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 895–97 (9th Cir. 2002).

Plaintiffs insist that because site-specific Forest Plan amendments exempting project compliance from Forest Plan Standards 3 and 4a are anticipated for the Hogum, Boulder Baldy, and Middleman Projects, they were reasonably foreseeable cumulative impacts.  According to Defendants, however, the Forest Service "will not be issuing Forest Plan amendments pertaining to Standards 3 or 4a for either the Hogum or Boulder Baldy projects."  (Doc. 13 at 3.)  Although Plaintiffs take issue with how that decision is phrased, the absence of site-specific amendments in those projects makes them no longer "relevant" to this case.  As a

result, Exhibits 1, 2, and 6 are rejected.[4]

The documents related to the Middleman Project pose a closer question. As discussed above, Exhibits 4 and 5 are too voluminous and remote in time to be reasonably considered. But Exhibit 3 is a 13-page Project Description containing a section specifically discussing a "Proposed Site-Specific Forest Plan Amendment." (*See* Doc. 11-3 at 9–10.) Accordingly, it is relevant to the Forest Service's decision to use a site-specific amendment here. Exhibit 3 is also dated January 2020, which implies that much of the information contained therein was known to the agency in December 2019. Under *Cachil*, Plaintiffs are permitted to supplement the record with Exhibit 3. Similarly, Exhibit 7 is a Montana, Fish, Wildlife and Parks' comment letter on the Middleman Project and contains direct references to concerns regarding activities that reduce elk security and cover. (Doc. 11-7.) While this document is dated September 2020, the concerns contained therein are concerns the State has consistently raised in response to the Forest Service's elk management. It is therefore reasonable to assume the State's position, if not this exact letter, was known to the agency at the time it approved

---

[4] Plaintiffs also argue that the Forest Service acted in bad faith by denying that it was going to use amendments for the Baldy and Hogum projects. Because the Forest Service is *not* going to do so, supplementation is not appropriate under a "bad faith" exemption. *Lands Council*, 395 F.3d at 1030.

the Stonewall Project.  Exhibit 7 is therefore also admitted as part of the record.[5]

Additionally, since the case was filed, Plaintiffs obtained certain documents regarding the Middleman Project through a Freedom of Information Act ("FOIA") request.  (*See* Doc. 22-1.)  These documents pre-date the 2019 ROD—they are dated February, July, and August 2019—and specifically address the Forest Service's pre-approval knowledge of a site-specific amendment for the Middleman Project.  That purported relevance was only increased during the December 7 hearing when Defendants denied any specific knowledge of the Middleman Project's elk impacts during this timeframe.  These documents are therefore made part of the record as well.

## B.     Judicial Notice

Alternatively, Plaintiffs ask the Court to take judicial notice of the proffered documents on the grounds that the documents are the "agency's own records." *Dent v. Holder*, 627 F.3d 365, 371 (9th Cir. 2010).  Courts may take judicial notice of a fact if it "is not subject to reasonable dispute because . . .  it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  While published government documents generally fall into this category, *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992,

---

[5] The Court therefore need not consider Exhibit 7's admission under the exemption for materials needed to "to explain technical terms or complex subject matter." *Lands Council*, 395 F.3d at 1030.

998–99 (9th Cir. 2010), "the contents of those documents cannot be used to second

guess an agency decision," *Probert*, 412 F. Supp. 3d at 1198.  "Fundamentally, a

party cannot circumvent the rules governing record supplementation by asking for

judicial notice rather than supplementation." *Id.* (internal quotation marks

omitted).   Accordingly, judicial notice is not appropriate.

### C.    Conclusion

Based on the above, the record is supplemented with Exhibits 3 and 7, as

well as the three exhibits attached to Plaintiffs' Response, (*see* Doc. 22-1).

## II.   Exhaustion

As another preliminary matter, Defendants argue that Plaintiffs failed to

raise several of their claims during the administrative review process and therefore

cannot raise them now.  That challenge lacks merit.

Under the APA, plaintiffs are required to exhaust the available

administrative remedies before bringing their claims in federal court.  5 U.S.C.

§ 704.  "Statutes and regulations governing the Forest Service reiterate the

administrative exhaustion requirement." *Idaho Sporting Cong., Inc. v.

Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002) (citing 7 U.S.C. § 6912(e) and 36

C.F.R. § 215.20).  The underlying rationale "is to avoid premature claims and to

ensure that the agency possessed of the most expertise in an area be given first shot

at resolving a claimant's difficulties." *Id.*  But claimants need not use "precise

legal formulations," and may "alert[] the decision maker to the problem in general terms." *Id.* At base, "[c]laims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met." *Id.* Defendants argue that seven claims have not been exhausted here:

> (a)    the Forest Service's analysis of elk habitat violated NEPA;
> (b)    the Forest Service's conclusion that it is conserving adequate and well-distributed habitat runs counter to the evidence and is misleading in violation of NEPA;
> (c)    the Forest Service violated NEPA by failing to disclose the letter from Montana Fish, Wildlife and Parks;
> (d)    the Forest Service failed to comply with Standard 6 in violation of NFMA and NEPA;
> (e)    Amendment #35 violates the 1982 NFMA planning regulations;
> (f)    the Forest Service failed to analyze alternatives to Amendment #35 in violation of NEPA; and
> (g)    the Forest Service failed to disclose and analyze cumulative effects of reasonably foreseeable site-specific Forest Plan amendments in violation of NEPA.

(*See* Doc. 19 at 11–12.)

In response, Plaintiffs insist that (a) through (f) were raised in the original Stonewall Project lawsuit. *See All. for the Wild Rockies v. Marten*, CV 17-21-M-DLC, Doc. 1 at ¶¶ 139-61 (Feb. 17, 2017). Specifically, Plaintiffs' March 25, 2019 comments on the Draft Supplemental EIS stated:

> In order to avoid repetition, we are incorporating by reference all of the issues previously raised in regard to the proposed management of elk habitat, including the impact of serial Forest Plan amendments on elk security, in the Stonewall Project in the legal complaint and briefs [Native Ecosystem Council] and [Alliance for the Wild Rockies] filed

14

against the previous Stonewall Project prior to the Park Fire.

FS_098413.  Defendants argue that this is insufficient because exhaustion requires

"objection," not just comments.  *See* 36 C.F.R. §§ 218.1–218.16.  Moreover,

"[o]bjections must be filed in writing," *id.* § 218.8(a), and "[i]ncorporation of

documents by reference is not allowed," *id.* § 218.8(b).  Defendants are therefore

correct that the above comments considered in isolation may not be sufficient to

exhaust.  But the analysis here is complicated by the fact this case has already been

litigated, or at least a previous complaint filed.  Thus, the "incorporated" claims are

not simply other arguments made in response to other projects, but specific

objections raised and then presented for judicial review against a version of *this*

Project.  (*See, e.g.*, CV 17-21-M-DLC, Doc. 1 at 23.)

Even so, these isolated comments are not the extent of Plaintiffs' activity, as

Plaintiffs provided more detailed comments in January 2019, *see* FS_098048–56,

and "objections" in October 2019, *see* FS_097656–89.  While Defendants argue

that these objections do not address the specific claims in this case, (*see* Doc. 24 at

8), that is not a fair reading.  Plaintiffs' elk-related objection specifically references

the failure to consider cumulative effects related to the site-specific amendments,

the failure "to maintain and/or enhance habitat characteristics favored by elk . . . in

areas that are important for security," and Montana Fish, Wildlife and Parks'

comments regarding lack of elk security.  FS_097677–79.  The comments that

predated these objections also specifically addressed the site-specific amendment, concerns regarding noncompliance with Forest Plan Standards 3 and 4a, habitat effectiveness, and elk security.  FS_098048–53.  While neither the objections nor the comments use precise legal language, they are specific enough to have made the agency aware of Plaintiffs' concerns.  *Idaho Sporting*, 305 F.3d at 966.

To the extent Plaintiffs did not identify any other projects that were using site-specific amendments as argued in (g) above, Plaintiffs persuasively argue they were not aware of the specific projects at the time as they were not included in the agency's record.  *See All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1034 (9th Cir. 2018).  Based on the above, Plaintiffs' claims were properly exhausted.

## III.   Elk Habitat

"NFMA creates a two-step process for the management of our national forests."  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1249 (9th Cir. 2005).  First, the Forest Service must develop, maintain, and, as appropriate, revise Forest Plans, which provide a framework for where and how certain activities can occur in national forests.  *Id.*; *see also* 16 U.S.C. § 1604(f)(1).  Second, the Forest Service must ensure that all individual projects within a forest are "consistent with each forest's overall management plan."  *Native Ecosystems Council*, 428 F.3d at 1249; *see also* 16 U.S.C. § 1604(i).

In the Helena National Forest, elk are a management indicator species.

16

FS_065134.  "Indicator species have been identified for those species groups whose habitat is most likely to be changed by Forest management activities." FS_065134.  Populations of these species are therefore "monitored to measure the effect of management activities on representative wildlife habitats with the objective of ensuring that viable populations of existing . . . animal species are maintained."  FS_065134.  "Elk are evaluated in part by looking at three variables[,] including summer range hiding cover, road densities during hunting season, and winter range thermal cover."  FS_084392.  "Hiding cover" is defined as "a stand of coniferous trees having a crown closure of greater than 40 percent" across a "minimum patch size of 40 acres."  FS_084392.  "Thermal cover" is defined as "a stand of coniferous trees 40 feet or more tall with an average crown closure of 70 percent or more, and a minimum size of 15 acres."  FS_084392.  But based on "currently available vegetation mapping," canopy closure for thermal cover is measured at a threshold of 60 percent.  FS_084392.

As mentioned above, certain Forest Plan Standards apply to elk and elk habitat.  Specifically, Forest Plan Standard 3 provides that "elk summer range will be maintained at [50] percent or greater hiding cover and areas of winter range will be maintained at 25 percent or greater thermal cover."  FS_065134 (mandating 35% hiding cover); *see* FS_084392 (explaining 50% calculation).  Similarly, Forest Plan Standard 4a limits open road densities based on the percentage of

17

hiding cover during the October 15 to December 1 hunting period.  FS_065134–

35, 084392.  Additionally, the Forest Plan provides that for Management Area T-2,

"at least 25 percent thermal cover [must be maintained] on identified winter

range."  FS_065188.

The Project area is in Hunting Districts 281[6] on the Lincoln Ranger District

and contains the Beaver Creek-Lincoln Herd Unit to the west and the Keep Cool

Creek Herd Unit to the east.  FS_083174.  Project activities will only occur in the

Beaver Creek Herd Unit.  FS_096939, 096617, 097005.  All of the Beaver Creek

Herd Unit is considered elk summer range, while only a portion provides winter

range, FS_084394, and only a relatively small portion of that is on public land,

FS_084395 ("Within project area herd units approximately 65 percent of HD 281

winter range occurs off [National Forest System] lands.").  Overall, "[t]he project

area contains approximately 28 percent of the total HD 281 winter range and 57

percent of the total HD 281 summer range."  FS_084396.

There is no dispute that the current conditions on the Beaver Creek Herd

Unit do not meet the minimum threshold requirements for either hiding cover and

thermal cover under Standard 3 or open road density and hiding cover under

Standard 4a.  (*See* Doc. 21 at ¶¶ 48, 52); FS_097005–06.  There is also no dispute

that the Project will move the Beaver Creek Herd Unit further away from

---

[6] Six percent of the Project occurs in Hunting District 284.  *See* FS_083174.

consistency with these Forest Plan standards.  (Doc. 21 at ¶ 54.)  Generally, the

"Forest Service's failure to comply with the provisions of a Forest Plan is a

violation of NFMA."  *Native Ecosystem Council v. U.S. Forest Serv.*, 418 F.3d

953, 961 (9th Cir. 2005).  But the Forest Plan specifically provides exemptions

from Forest Plan standards: "If it is determined during project design that the best

way to meet the management area goals of the Forest Plan conflicts with a Forest

Plan standard, the Forest Supervisor may approve an exception to that standard for

that project."  FS_065131; *see also* 36 C.F.R. § 219.10(f) (1982).  Through a site-

specific amendment to the Forest Plan, the Stonewall Project has been exempted

from Standards 3 and 4a and part of T-2 in the Beaver Creek Herd Unit.

FS_097005.  According to the Forest Service,

> The amendment to exempt this project from Standards 3 and 4a and the
> thermal cover provision of management area T-2 should have minimal
> effect on overall elk populations.  While many factors contribute to elk
> numbers, exempting the project from these standards should not
> preclude the ability of Montana Fish, Wildlife and Parks to realize its
> elk objectives in hunting district 281.  . . . [Nor should it] affect the
> Forest's ability to realize the elk population established in the Forest
> Plan.  Furthermore, this exemption should not preclude the Forest's
> ability to achieve the goals and objectives as outlined in the Forest Plan.
> The goal, to "maintain and improve the habitat over time to support big
> game and other wildlife species" (USDA 1986, p.II/1) is being achieved
> through the retention of hiding cover elsewhere throughout the project
> area.   Our objective, - "management will emphasize . . . the
> maintenance or enhancement of elk habitat . . ." (USDA 1986, p. II/4)
> – is also being realized for the same reasons.

FS_096622.

Plaintiffs argue that the Forest Service's analysis of elk habitat for the Stonewall Project violates NEPA and NFMA in three ways: (1) the Forest Service's conclusion in the EIS that it is conserving adequate, abundant, and well-distributed elk habitat is contrary to the evidence in the record; (2) the Forest Service failed to disclose significant concerns of Montana Fish, Wildlife and Parks regarding the degraded status of elk habitat on the Lincoln Ranger District in the EIS; and (3) the EIS fails to show that the Project complies with Forest Plan Standard 6.  Plaintiffs' final argument has merit.

### A.    Conservation of Adequate Elk Habitat

Plaintiffs first argue that the Forest Service's conclusion that it is conserving adequate, abundant, and well-distributed elk habitat is contrary to the evidence in the record in violation of NEPA.  Plaintiffs primarily criticize the Forest Service's reliance on elk population numbers rather than the following six qualitative measures for adequate and well-distributed elk habitat:

(1)    Forest Plan Standard 3 – hiding cover

(2)    Forest Plan Standard 3 – thermal cover

(3)    Forest Plan Standard 4a – open road density and hiding cover

(4)    Habitat Effectiveness

(5)    Elk Security – Hillis Method

(6)    Elk Security – Blackfoot Method

(Doc. 22 at 12.)  According to Plaintiffs, despite failing all six measures, the EIS represents that "[e]lk habitat would continue to be abundant and well-distributed," FS_083363, and that "elk security and walk-in hunting opportunity objectives for this [Elk Herd Unit] . . . would be maintained,"  FS_083353.  Plaintiffs therefore argue these conclusions are arbitrary and capricious, lack scientific integrity, and mislead the public, all in violation of NEPA.

In response, Defendants argue that the first three measures do not apply because, as discussed above, Amendment #35 exempts the Project from Forest Plan Standards 3 and 4a.  *See* FS_096647.  Defendants further argue that while habitat effectiveness and elk security are "two additional analysis tools used to assess potential effects at the elk herd unit level," they "do not constitute direction and do not replace existing Forest Plan standards."  FS_084393; *see also* FS_097005 ("Habitat effectiveness is not a Helena Forest Plan standard.").  Finally, Defendants argue that the Hillis and Blackfoot methods are actually the same metric.  *See* FS_084393–94, 088168–69.  The site-specific Forest Plan amendment—Amendment #35—is addressed in its own section; habitat effectiveness and elk security are addressed below.

## 1.    **Habitat Effectiveness**

"Habitat effectiveness is a function of suitable habitat components (cover, forage, wet sites, and travel routes) and reduced human disturbance (generally

21

measured in terms of open roads and motorized trails)." FS_084571. As explained

in the EIS,

> Habitat Effectiveness evaluates open road densities with respect to habitat use of summer range outside the big game season. Habitat Effectiveness is based on work conducted by Lyon (1979 and 1983) and is based on roads open to the public from May 16 to October 14. The Forest Plan does not include a specific threshold for habitat effectiveness.

FS_084393; *see also* FS_084396. Road densities are measured across the entire

herd unit and include private lands. FS_084398. According to Christensen (et al.

1993), "habitat effectiveness should be 70 percent or greater (open road density

less than 0.7 miles per square mile) for areas intended to benefit elk summer

habitat and retain high use." FS_084398. And "[a]reas where elk are one of the

primary resource consideration[s] should have habitat effectiveness of 50 percent

or greater (open road density of 1.9 miles per square mile or less)." FS_084398.

Defendants argue that based on this record—the nonbinding nature of the

metric and the fact that the 50 percent requirement only applies to areas where elk

are a "primary resource consideration"—the Forest Service adequately considered

habitat effectiveness and the evidence does not contradict its conclusion. That

argument is generally persuasive. The Project need not comply with habitat

effectiveness percentages or measures in order to comply with the law;

nevertheless, once the agency identified habitat effectiveness as a relevant

consideration, it was required to meaningfully evaluate the Project under that

22

metric.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("NEPA itself does not mandate particular results, but simply prescribes the necessary process.").  The question then is whether the agency did so and whether the evidence supports the agency's conclusion.

According to the 2015 EIS, "[h]abitat effectiveness is currently below 50 percent in both the Beaver Creek and Keep Cool Creek [Herd Unit]s," and it would remain under 50 percent post-Project implementation.  FS_084398, 084571; *see also* FS_084578 ("Open road density during [the Project] . . . would increase to 3.4 miles per square mile[.]"); *see also* FS_084628 ("Habitat Effectiveness . . . would not be altered from the current condition post-implementation").  Nevertheless, the Forest Service concluded that adequate measures would be taken to "minimize" project impacts:

> For example, logging activities would be confined to a single drainage at a time . . . , which would increase the probability of immediate return by displaced elk.  Also, roads built and then obligated after use would be closed to the public which should reduce some displacement of elk. Because all roads constructed would be obliterated following use and roads used for haul would return to their pre-project conditions, habitat effectiveness would be restored to the existing condition following implementation.

FS_084578.  The 2015 EIS states that "[d]espite habitat effectiveness numbers less than 50 precent, elk population numbers are at objective within hunting district 281."  FS_084590.  The Supplemental EIS indicates that the analysis has not changed since then, except that "[d]ue to fewer treatment acres, a 4.5 mile

reduction in haul routes, and a reduced timeframe for project implementation, the effects to summertime habitat effectiveness would be slightly less than disclosed in the 2016 project decision."  FS_097005; *see* FS_096617.

Ultimately, by recognizing the habitat effectiveness failures of the Project but explaining how they will be mitigated, the Forest Service neither ignored the evidence nor misled the public.  *See Friends of Bitterroot v. Marten*, 2020 WL 5804251, at *8 (D. Mont. Sept. 29, 2020).  That is sufficient under NEPA.

### 2.    Elk Security

"An elk security analysis is completed to address elk vulnerability during the hunting season."  FS_084393.  "Security is the result of a combination of factors that allow elk to remain in the specific area while under stress from hunting."  FS_083180.  "More specifically, these are areas of coniferous cover large enough and far enough away from open roads to provide security."  FS_083180.  There are arguably two methods for assessing elk security—the Hillis method and the Blackfoot method.  Defendants are correct, however, that the two overlap.

The Hillis paradigm requires at least 30% of an elk herd unit contain blocks of habitat that are at least 0.5 miles from an open road and at least 250 acres in size.  FS_083180; *see also* FS_084393.  Thus, the Hillis method is measured in "blocks of hiding cover" across the entire Elk Herd Unit, regardless of land ownership.  FS_084393, 107852. This approach has been modified, however, "to

reflect local knowledge of elk and their habitat use." FS_084393.  Here,

> [i]n contrast to the Hillis et al. (1991) study areas, the landscape of the Lincoln Ranger District tends to include open habitat and areas where forests and grasslands are interspersed in a mosaic pattern.  As such, consideration of the quantity and quality of forested cover across the entire elk habitat unit would be better than defining security areas as 'blocks of hiding cover.'  This would allow for recognition of those situations where a mosaic of forest and/or open habitats exists, but which operationally are secure.

FS_084393; *see also* FS_088168.  Accordingly, in the Helena National Forest for "open east-side Forest habitats," this modification is reflected in what is known as the Blackfoot method.  *See* FS_084393–94.  Under the Blackfoot method, a 50% minimum of elk security is required, and the percentage is calculated with a denominator equivalent to the proportion of an Elk Herd Unit within the boundary of the Lincoln Ranger District.  FS_084393.  Additionally, security blocks must be at least 1,000 acres in size and at least 0.5 miles from a motorized route open to the public between September 1 and December 1, and blocks do not include any constrictions less than 1/2 mile in width.  FS_084393, 097006.

The April 2015 FEIS applied the Hillis method.  *See* FS_083173.  But in response to comments, the Forest Service indicated it would apply the Blackfoot method, *see* FS_087522, and then did so in the August 2015 FEIS, *see* FS_084393–94.  That analysis revealed that while there would be short-term change in elk security during Project implementation, those short-term changes would be mitigated and result in a long-term increase in elk security.  *See*

25

FS_084590.  As was the case with habitat effectiveness, the record shows that the agency reasonably considered elk security under both the Hillis and Blackfoot methods in assessing the Project and its conclusions are not contrary to that evidence; NEPA requires no more.

### 3.    Conclusion

Ultimately, the 2015 FEIS presented a "thorough and complete analysis of the Project's potential effects on elk habitat."  (Doc. 19 at 13.)  According to that analysis, the long-term benefits under the Project outweigh the negative short-term effects.  In so concluding, the agency considered that the Project will "temporarily reduce hiding and thermal cover, the amount, quality and distribution of forage would increase, leading to a decrease in elk displacement to private land."  (Doc. 19 at 13) (citing FS_084590, 085275–76, 085350–52, 097004–09)).  Thus, the Forest Service considered factors beyond mere elk population numbers:

> In summary, while this project may affect elk to some extent by removing hiding and thermal cover, the Forest would retain habitat components necessary to support the elk population directed by the Forest Plan as evidenced by the current elk numbers Forestwide.  We would also continue to achieve our objective of 'ensuring that viable populations of existing . . . animal species are maintained' (USDA 1986, p. II/7).

FS_084610.  That conclusion is neither arbitrary nor capricious.

### B.    Montana Fish, Wildlife and Parks' Comment Letter

Plaintiffs further challenge the Forest Service's alleged refusal to disclose

what Plaintiffs characterize as significant concerns of Montana Fish, Wildlife and Parks regarding the degraded status of elk habitat on the Lincoln Ranger District. In May 2014, Montana Fish, Wildlife and Parks objected to the Blackfoot Travel Plan, *inter alia*, because habitat, not elk population numbers, is "[t]he correct measure of the [big game security] standard's adequacy," FS_107851, and "bull survival . . . has consistently been well below the objective of 15 bulls:100 cows described in the Montana Final Elk Management Plan," FS_107939.  Plaintiffs argue that the Forest Service violated NEPA by failing to include these comments in the EIS for the Stonewall Project.  In response, Defendants emphasize that the comment letter at issue was directed at the Blackfoot Travel Plan, "an entirely different agency action," (Doc. 24 at 13), and that the Stonewall Project documents adequately consider these issues.  Defendants have the better argument.

Pursuant to NEPA's implementing regulations, a draft EIS must "discuss all major points of view on the environmental impacts of the alternatives," 40 C.F.R. § 1502.9(b), and a final EIS must "discuss any responsible opposing view that was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised," *id.* § 1502.9(c).  The regulations "are intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies."  *Id.* § 1500.1(b).  Fundamentally, these "disclosure requirement[s] obligate the agency

to make available to the public high quality information, including accurate scientific analysis, expert agency comments and public scrutiny, before decisions are made and actions are taken." *Ctr. for Bio. Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003).

Defendants argue that the views of Montana Fish, Wildlife and Parks are not an "opposing view" directed at the "proposed action." *See* 40 C.F.R. § 1502.9. To the contrary, Defendants note that—with the exception of proposed treatments in certain harvest units—Montana Fish, Wildlife and Parks submitted comments in support of the Stonewall Project. *See* FS_098218–19, 097084–85. Thus, Defendants persuasively argue that the Forest Service was not required to address a specific letter that was submitted in response to the Blackfoot Travel Plan. Nevertheless, Plaintiffs argue that it should have been addressed because (1) the Stonewall Project is tiered to the Travel Plan and (2) Plaintiffs' own comments on the Project reiterated Fish, Wildlife and Parks' concerns.

As to their first argument, Plaintiffs aver that the Project is tiered to the Travel Plan because the Supplemental EIS states: "The Stonewall Vegetation Project is not a travel planning project and does not propose to change the permanent road system in the project area. Travel management of existing routes is addressed in the Blackfoot-North Divide Winter Travel Plan (September 2013) and the Blackfoot Non-Winter Travel Plan (March 2016)." FS_096618.

Defendants are correct, however, that this reference does not mean that the elk habitat analysis for the Project is "tiered" to the Travel Plan; rather, the Project includes its own analysis of elk habitat and security.

As to Plaintiffs' second argument, they did raise concerns related to elk habitat and security in their 2015 objection to the Stonewall Project and, in doing so, specifically referenced "MFWP comments" from a 2014 letter.[7] *See* FS_087413–14. Nevertheless, the Forest Service responded to Plaintiffs' comments, indicating it would revisit the EIS to evaluate elk security in accordance with the Blackfoot method. *See* FS_087522, 085089. As discussed above, the EIS then reflects consideration of habitat effectiveness and elk security, *see* FS_084393–94, as well as the bull to cow ratios used by the Montana Fish, Wildlife and Parks, *see* FS_084603, 084608–09. And the ROD concludes: "The metrics used by the Montana Department of Fish, Wildlife, and Parks to determine if elk objectives are being met indicate that for the most part the hunting districts that overlap with the Forest are at or above Montana Fish, Wildlife and Parks objectives." FS_096612. The agency therefore considered the relevant concerns.

Plaintiffs maintain, however, that the Forest Service improperly focused on elk populations. At oral argument, Plaintiffs persuasively explained why habitat preservation is different from elk population numbers. Put simply, the Forest Plan

---

[7] Plaintiffs' comment notes the incorrect month. (*See* Doc. 24 at 15 n.3.)

seeks to preserve habitat in order to keep elk on public land during hunting season—a consideration not reflected in sheer population.  *See* FS_084610 ("While some of the elk in these hunting districts spend all of part of their time on non-Helena National Forest land, a considerable number of them—well in excess of 6,400—are part of the Helena [National Forest] population.").  Nevertheless, the Forest Service considered habitat effectiveness and elk security as discussed above. As argued by Defendants, "[e]lk population numbers were clearly not the sole focus of [the Forest Service]'s analysis, but the numbers confirmed sufficient habitat is available on the Forest and the Project would not adversely affect elk habitat or elk population."  (Doc. 24 at 10.)  While the Forest Service's analysis was sufficient under NEPA, the tension between population and habitat standards has major implications for the evaluation of the agency's use of a site-specific Forest Plan amendment under NFMA.

### C.    Forest Plan Standard 6

Finally, Plaintiffs challenge the Supplemental EIS under NFMA for failing to comply with Forest Plan Standard 6.  Forest Plan Standard 6 mandates that "Montana Cooperative Elk-Logging Study Recommendations, in [Forest Plan] Appendix C, will be followed during timber sale and road construction projects." FS_065136, 097007.  Appendix C contains eleven recommendations, including (1) security during logging operations, (2) redistribution of elk, (3) traditional

home range use by elk, (4) road construction and design, (5) road management, (6) area closures during the hunting season, (7) clearcuts, (8) cover type, (9) moist sites, (10) elk/cattle relationships, and (11) winter range.  FS_097007–08; *see also* FS_065312–22.  The Supplemental EIS concludes that the Project "is consistent" with each one.  FS_097007–08.

Plaintiffs' challenge specifically focuses on the "Road Management Recommendation."  In referencing road densities, the 2015 EIS states:

> *Road management –* This recommendation is also intended to maintain elk security through management of road densities.  Implementation of Alternatives 2 and 3 [current Alternative 4] would result in short-term (5 years or less) increase in road density during implementation.  New roads will not be open to the public.  Elk security would be maintained over the long-term and both alternatives are consistent with this recommendation.

FS_083365.  The Supplemental EIS simply states that "Alternative 4 is consistent with the 2016 project decision . . . except 4.5 fewer miles of existing road would not be used as a haul route."  FS_97008.  Plaintiffs argue that this language is misleading because it does not reference the actual standard, represents elk security will be maintained despite the evidence above, and implies that "long-term" security is the relevant consideration.  Plaintiffs' arguments have some merit.

As to Plaintiffs' first argument, Defendants persuasively argue that the Project documents need not include the complete text of Appendix C so long as it is accurately reflected.  And here, the Forest Service correctly listed all eleven

components of Forest Plan Standard 6 and provided a brief description for each. *See* FS_083365–66, 097007–08. Yet, the summary provided by the Forest Service omits important road density language. Specifically, Appendix C states: "Where maintenance of elk habitat quality and security is an important consideration, open road densities should be held to a low level[] and every open road should be carefully evaluated to determine the possible consequences for elk." FS_065316. This requirement is not reflected in either EIS.

At oral argument, Defendants argued that Forest Plan Standard 6 is not triggered here because the Project does not result in the construction of any new roads "open" to the public. But Standard 6 applies to all "open" roads, not just new roads. Road maintenance is anticipated on 25 miles of road in the Project area. *See* FS_096606–07, 108441. Closure of these roads during Project activities is not addressed in the context of Standard 6 despite their importance. *See* FS_065316 ("Few considerations in forest management appear to provide a better opportunity for immediate mitigation in the management of elk habitat than road closures."). While the Revised Biological Assessment states that "there will be no changes to public motorized access during or after project implementation," FS_108441, it is not clear that the agency contemplated increased use of "open" improved roads. *But see* FS_084578 (indicating the roads will be "returned" to previous state). The Forest Service was therefore required to consider whether the

Project met the "low level" requirement of Standard 6.

Defendants insist, however, that the potential road densities under the Project—1.7 miles per square mile, *see* FS_085297—are a "low level," without providing a definition for the term.  In doing so, Defendants rely on the fact that the Project will result in an increase of only 0.3 miles per square mile, FS_085297, new roads will not be open to the public, FS_084592, there will be only 0.9 miles of temporary road construction, FS_085296, and open-road density will return to pre-Project levels, FS_085296.  But even if that means the Project meets the "low level" requirements of Standard 6 as defined by the Forest Service (a definition not present in the record), that analysis is absent from the agency decision documents.

Moreover, Plaintiffs argue that "low level" is defined as "less than one-half mile of road per square mile."  FS_042703.  Defendants disagree with this definition for a number of reasons.  First, they argue that the "less than one-half mile" language is not found in Appendix C and is therefore not part of Standard 6.  However, the language is taken from the "Final Report of the Montana Cooperative Elk-Logging Study 1970-1985," *see* FS_042689–746, which is the source document for Appendix C, *see* FS_065312 ("Appendix C: Recommendations from the Final Report of the [M]ontana Cooperative Elk-Logging Study . . .").  It is therefore reasonable to assume that definitions contained in that document apply here.  Even so, Defendants argue that the "less

33

than one-half mile" language is only discussed in the context of "Area Closures During Hunting Season" in that source document.  *See* FS_042701–03.  Yet the Forest Service does not offer an alternative definition for "low level."  Indeed, Plaintiffs' definition is the only definition in the record, and it is not met here.

The Forest Service acted arbitrarily and capriciously by failing to determine whether road densities under the Project meet the "low level" requirements of Standard 6, whatever they may be.  Remand is therefore required.

## IV.    Site-Specific Forest Plan Amendment 35

As mentioned above, NFMA allows the Forest Service to amend Forest Plans, 16 U.S.C. § 1604(f)(4), so long as the amendment complies with both NFMA and NEPA, *Native Ecosystems Council*, 418 F.3d at 961.  If a forest plan amendment constitutes a "significant change" in the Forest Plan, the Forest Service must prepare a full environmental impact statement ("EIS") and analyze the amendment in the same procedure as it analyzed the Forest Plan.  *Id.*; *see also* 36 C.F.R. § 219.10(f) (1982).  But if not, no further analysis is required.  As mentioned above, the Stonewall Project includes a Project-specific Forest Plan amendment (Amendment #35) exempting the Project from the following Forest Plan requirements: (1) Forest-wide Standard 3 for hiding cover on summer range and thermal cover on winter range; (2) Forest-wide Standard 4a for open road densities during the big game hunting season; and (3) Management Area T-2

standard for thermal cover on winter range.  FS_096608.

Plaintiffs persuasively argue that Amendment #35 is unlawful for four reasons: (1) it violates the 1982 NFMA planning regulations because it does not ensure adequate and well-distributed elk habitat; (2) the Forest Service failed to analyze any reasonable alternatives as required by NEPA; (3) the Forest Service failed to disclose reasonably foreseeable site-specific Forest Plan Amendments for other Projects as required by NEPA; and (4) the Forest Service's practice of issuing successive site-specific Forest Plan amendments amounts to a "significant" Forest Plan amendment that must be analyzed in a full EIS pursuant to NFMA. These matters are discussed in turn.

A.    **NFMA 1982 Planning Regulation**

Plaintiffs first argue that Amendment #35 must comply with 36 C.F.R. § 219.19 (1982), a substantive provision known as the management indicator species rule, which requires, *inter alia*, that "habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area." This is referred to as the "1982 viability rule."  Because this provision was superseded in 2000, *see Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012), there appear to be only two ways it could apply here; both indicate that it does.

First, the Forest Service is required to apply the requirements of the superseded 1982 viability rule to "the extent they are incorporated into the relevant forest plan." *Id.* at 1014 (cleaned up); *see also* 36 C.F.R. § 219.17(c) ("No obligations remain from any prior planning regulation, except those that are specifically included in a unit's existing plan."). A plan incorporates the 1982 rule's viability requirements if it "clearly" contains "*specific provisions* regarding wildlife viability." *Earth Island*, 697 F.3d at 1014 (quoting *Earth Island Inst. v. Carlton*, 626 F.3d 462, 470 (9th Cir. 2012)). Here, the Forest Plan states that indicator species "will be monitored to measure the effect of management activities on representative wildlife habitats with the objective of ensuring that viable populations of existing native and desirable non-native plant and animal species are maintained." FS_065134.

Similar language was used in both *Earth Island*, 697 F.3d at 1014 ("The Forest Service must manage habitat to, at the least, maintain viable populations."), and *Carlton*, 626 F.3d at 470 (management approach "will provide the fish and wildlife habitat and other ecological conditions necessary to maintain well-distributed viable populations of vertebrate species"). Neither case found that the forest plans at issue "incorporate[d] the 1982 rule's viability requirement." *Earth Island*, 697 F.3d at 1014. But "[a] forest plan does not have to incorporate all aspects of the 1982 viability requirements." *Earth Island*, 697 F.3d at 1014 n.1. In

*Carlton*, for example, the court explained that "only the aspects of § 219.19 in the 1982 planning rule related to selecting [management indicator species] (§ 219.19(a)(1)) and monitoring during forest plan implementation (§ 219.19(a)(6)) apply.  Other aspects of § 219.19 are related to forest plan development or revision and do not apply."  626 F.3d at 472 (emphasis and footnotes omitted).  Here, the Forest Plan outlines its selection of indicator species to be monitored (§ 219.19(a)(1)), *see* FS_065134; limits road and visitor access in light of habitat needs (§ 219.19(a)(4)), *see* FS_065134–35; defines habitat needs (§ 219.19(a)(7)), *see* FS_065134; and sets population targets (§ 219.19(a)(6)), *see* FS_065275. Thus, at least some of the 1982 regulation were incorporated.

But even if that were not the case, Plaintiffs insist that the old regulation applies because the Forest Service invoked the 1982 planning regulations in the Project's decision documents.  That argument has merit.  In 2012, the Forest Service issued new planning regulations that allowed for the amendment of forest plans "at any time," 36 C.F.R. § 219.13(a), insofar as those amendments are "consistent with the Forest Service NEPA procedures," *id.* § 219.13(b)(3) (2012). As explained in the ROD for this Project, "[t]he 2012 rule includes a transition period during which plan amendments may be initiated under the provisions of the prior planning regulation for 3 years after May 9, 2012 and may be completed and approved under those provisions."  FS_096717; *see* 36 C.F.R. § 219.17(b)(2).

37

Here, the decision documents indicate that Amendment #35, which was first proposed in 2010, "is being completed under the requirements of the 1982 regulations."  FS_096717; *see also* FS_096622.  Based on that language, Plaintiffs contend the Project is subject to the 1982 viability rule.  According to Defendants, that invocation is limited to § 219.10(f) (1982), which governs the amendment process, and that Plaintiffs "conflate[] substantive Forest planning provisions with amendment processing provisions."  (Doc. 24 at 21.)  While there does not appear to be a case directly on point, *see Lands Council v. McNair*, 537 F.3d 981 n.5 (9th Cir. 2008) ("We need not resolve Lands Council's eleventh hour suggestion that § 219.19 is applicable because the SFEIS and ROD incorporated that regulation."), Plaintiffs' interpretation is more persuasive.

Despite Defendants' attempt to distinguish between Part 219's "amendment" provisions and its "substantive" provisions, Part 219 as a whole is considered NFMA's "planning" regulations.  *See* CFR Section ("Part 219–Planning").  And courts have determined that the invocation of the 1982 regulations extends beyond § 219.10(f)'s amendment provision.  *See All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1109 n.1 (9th Cir. 2018) (referencing § 219.15); *Cent. Sierra Envt'l Resource Ctr. v. Stanislaus*, 2019 WL 3564155, at *21 (E.D. Cal. Aug. 6, 2019) (referencing§ 219.10(e)); *cf. Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582, 587 (4th Cir. 2018) (addressing process for compliance with other provisions

of 2012 rule).  The view of Part 219 as a single unit is also reflected in the 2012

Planning Rule:

> For plan development, plan amendments, or plan revisions that were
> initiated before May 9, 2012, the responsible official may complete and
> approve the plan, plan amendment, or plan revision in conformance
> with the provisions of *the prior planning regulation, including its*
> *transition provisions (36 CFR part 219, published at 36 CFR parts 200*
> *to 299*, revised as of July 1, 2010), or may conform the plan, plan
> amendment, or plan revision to the requirements of this part.

36 C.F.R. § 219.17(c) (emphasis added).

Moreover, in the absence of the application of the 1982 viability rule, it is

not clear from either the record or the briefing that the Forest Service addressed the

Project's compliance with the 2012 rule that replaced it.  To the contrary, the EIS

specifically invokes the habitat viability language contained in the 1986 Forest

Plan.  *See* FS_084610.  Accordingly, Amendment #35 is subject to the provisions

of 1982 viability rule, or § 219.19 (1982).

Defendants insist, however, that the elements of the 1982 viability rule were

adequately addressed.  (Doc. 24 at 21 n.5 (citing FS_085327–44).)  At best,

Defendants' argument is a post hoc rationalization of the agency's decision.  It is

the agency that must show compliance with the 1982 viability rule.

**B.     Alternatives**

"NEPA requires that agencies analyze reasonable alternatives to a proposed

action in an EIS, *see* 40 C.F.R. § 1502.14, so that public officials can 'make

decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment,' *id.* at 1500.1(c)." *Tinian Women Ass'n v. U.S. Dep't of Navy*, 976 F.3d 832, 840 (9th Cir. 2020); *see* 42 U.S.C. § 4332(C)(iii). "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action, and sufficient to permit a reasoned choice." *Alaska Wilderness Recreation & Tourism Ass'n v Morrison*, 67 F.3d 723, 729 (9th Cir. 1995) (internal quotation marks and alteration omitted). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Id.*

Plaintiffs argue that the Forest Service failed to consider any alternatives to Amendment #35 and that it should have considered the Blackfoot method as a "viable but unexamined alternative." Defendants argue that because the NEPA documents considered a "no action" alternative in addition to the preferred action, they adequately considered alternatives in connection with Amendment #35. Plaintiffs have the better argument, in part.

Defendants first suggest that the use of a Forest Plan exemption "presents a binary choice: Either the standard applies, or it does not." (Doc. 24 at 24.) Defendants therefore argue that a third, entirely different metric—such as the Blackfoot method—is not "within the range dictated by the nature and scope of the proposed action." *Alaska Wilderness*, 67 F.3d at 729. While Defendants are

40

correct that the ultimate decision to exempt an action from the Forest Plan standards is an "either/or" proposition, there could be other reasonable alternatives apart from "no action" that do not require a Forest Plan exemption. Indeed, it seems that some sort of comparison is necessary to conclude that such an exemption was in fact "the best way to meet management area goals." FS_092292. Thus, the Forest Service was either required to consider additional alternatives or explicitly explain why no such alternatives exist. Remand is therefore appropriate.

Plaintiffs' request for a specific alternative, however, lacks merit. While the Forest Service may consider an alternative that adheres more closely to the Blackfoot method, the nature of the actions considered falls within the agency's purview. Additionally, the Forest Service is not required to consider alternatives that are redundant to either the analysis or consequences of existing alternatives. *Native Ecosystems Council*, 428 F.3d at 1248. Thus, the type of alternative considered, if any, shall be left to the Forest Service.

### C.    Reasonably Foreseeable Exemptions for Other Projects

Plaintiffs further argue that the Forest Service failed to consider the effects of reasonably foreseeable future Forest Plan amendments, specifically regarding the Middleman, Boulder Baldy, and Hogum Projects. As mentioned above, the Forest Service has indicated that it does not plan to use site-specific amendments for the Boulder Baldy or Hogum Projects. (Doc. 13 at 10; Doc. 13-1 at ¶ 13; Doc.

41

19 at 32–33.) This challenge is therefore limited to the Middleman Project.

"NEPA always requires that an environmental analysis for a single project consider the cumulative impacts of that project together with 'past, present and reasonably foreseeable future actions.'" *Native Ecosystems Council*, 304 F.3d at 895 (citing 40 CFR § 1508.7 (2019)). This applies to reasonably foreseeable forest plan amendments. *Id.* at 896. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (2019).[8]

Here there is no dispute that the Forest Service is planning to exempt the Middleman Project. (*See* Doc. 13-1 at ¶ 14.) But, according to Defendants, the Middleman Project was not reasonably foreseeable at the time of the Stonewall decision; at best, the specifics of the Middleman Project were, "highly speculative," uncertain, and unforeseeable. (Doc. 13-1 at ¶¶ 10, 12.) Defendants are correct that the Forest Service "is not required to engage in speculative analysis." *N. Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078 (9th Cir. 2011). "However, projects need not be finalized before they are reasonably foreseeable." *Id.* "NEPA requires that an EIS engage in reasonable forecasting. Because speculation is implicit in NEPA, [courts] must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and

---

[8] As discussed below, § 1508.7 has since been repealed.

all discussion of future environmental effects as crystal ball inquiry." *Id.* (internal quotation marks and alterations omitted).

Plaintiffs have supplemented the record with Exhibit 3, which is titled "Middleman Project: Detailed Information." (*See* Doc. 11-3.) That document specifically identifies the need for a site-specific forest plan amendment akin to Amendment #35 in five herd units.[9] (*Id.* at 9–10.) This document is dated January 2020, which is only one month after the approval of the Stonewall Project. Contrary to being speculative, this document indicates the Forest Service was actively working on the Middleman proposed site-specific amendment at that time. The FOIA documents submitted by Plaintiffs support this assumption and show that discussions of a site-specific amendment for the Middleman Project began as early as February 2019 and were acknowledged in internal correspondence in July and August 2019. (*See* Doc. 22-1.) It was therefore surprising that during oral argument Defendants stated that as of December 2019 none of the projects, including the Middleman Project, had even been proposed let alone that they would affect elk cover. The record contradicts this assertion.

Defendants further argue that the effects of Amendment #35 "are limited in geographic scope and carry minimal impacts to elk locally and toward the overall

---

[9] While one of those Herd Units is identified as the "Beaver Creek Herd Unit," (*see* Doc. 11-3 at 9), that is a different Beaver Creek Herd Unit than the one in the Stonewall Project area, (*see* Doc. 13-1 at ¶ 8).

Forest wide perspective as described" in the cumulative effects analysis.
FS_096718.  They further insist that a "forest-wide" scope is not always
appropriate for a cumulative effects analysis, and that the Middleman Project is not
within the cumulative effects area for the Stonewall Project.  *See* FS_084440.
Neither proposition is supported by this record.  The "cumulative effects" section
recognizes that both the State's elk management objectives and population goals
are, at a minimum, Forest-wide.  *See* FS_096716–17.   Moreover, the site-specific
amendments that *are* included in the Project's cumulative effects analysis include
projects within the very same hunting district as the Middleman Project, HD 392.
*See* FS_096702–10 (Miller Project, Jimtown Project, Cave Gulch Project).

Accordingly, it was arbitrary and capricious for the Forest Service to not
consider the site-specific amendment in the Middleman Project in its cumulative
effects analysis.  Remand is therefore required.

### D.    Successive Site-Specific Amendments

"Under NFMA, the Forest Service may amend a Forest Plan 'in any manner
whatsoever,' 16 U.S.C. § 1604(f)(4), but any Forest Plan amendment that would
result in a 'significant change' in the plan requires the preparation of an EIS."
*Native Ecosystems Council*, 304 F.3d at 898; *see also* 36 C.F.R. § 219.10(f)
(1982).  Plaintiffs argue "the Forest Service's practice of issuing successive site-
specific Forest Plan amendments amounts to a *de facto* significant Forest Plan

amendment that must be analyzed in a full EIS." (Doc. 15 at 28.)  According to

the Forest Service Manual, the following changes are considered not significant:

> 1.  Actions that do not significantly alter the multiple-use goals and objectives for long-term land and resource management.
>
> 2.  Adjustments of management area boundaries of management prescriptions resulting from further on-site analysis when the adjustments do not cause significant changes in the multiple-use goals and objectives for long-term land and resource management.
>
> 3.  Minor changes in standards and guidelines.
>
> 4.  Opportunities for additional projects or activities that will contribute to achievement of the management prescription.

FS_096718.  The Forest Service found that Amendment #35 was not significant

under this framework.  *See* FS_096718–19 (Table 8).  But Plaintiffs do not really

argue that Amendment #35 is significant on its own; rather, Plaintiffs insist

Amendment #35 causes a "significant change" because it, in conjunction with

previous and future site-specific amendments, effectively invalidates Standards 3

and 4a of the Forest Plan.  That argument has merit.

According to the Supplemental EIS, the Forest Service has issued a "site-

specific" exemption from Forest Plan Standards 4a and/or 3 at least eight times

prior to this Project: (1) Tenmile Project, (2) Telegraph Project, (3) Red Mountain

Flume/Chessman Project, (4) Cabin Gulch Project, (5) Hazardous Tree Removal

Project, (6) Cave Gulch Project, (7) Jimtown Project, and (8) Miller Mountain

Project.  FS_096702–09.  While the Forest Service's analysis shows that those

exemptions have not negatively impacted elk populations despite their impact on elk cover, *see* FS_096709, that conclusion misses the mark.  As argued by Plaintiffs at the December 7 hearing, the Forest Plan Standards at issue are directed at maintaining elk habitat and cover, *not* at increasing elk population.  Every single prior site-specific amendment addressed in the EIS reduces elk cover, *see* FS_096703–09, in direct contravention of binding Forest Plan Standards.  Put differently, the "significance" analysis in this context is not focused on the effect on the species, but rather the effect on the *Plan*.  While the Forest Service effectively shows a maintenance of elk populations, the Plan requires maintenance of habitat and cover.

That tension is only made more apparent when one considers that the Forest Service has actively avoided complying with any metric related to elk habitat or cover.  As discussed in the NEPA context above, Defendants considered both habitat effectiveness guidelines and elk security standards but ultimately rejected them as "non-binding."  But instead of then complying with the undisputedly "binding" Forest Plan Standards for elk, the agency sought an exemption, once again favoring population over habitat.  In its summary of the other amendments, the Forest Service states that bull survival numbers indicate that "cover alone may not be a predictor of elk numbers."  FS_096709.  FS_096709.  But the rejection of "cover" in favor of "population" is not a minor deviation from the Plan; it is an

46

entirely different approach to elk management.  The Forest Service's conclusions

regarding the interplay between cover and elk population reinforce the significance

of not only the exemption here, but successive exemptions from Standards 3 and

4a.  If Standard 3 and 4a are no longer viable—which is disputed by Montana Fish,

Wildlife and Parks and Plaintiffs, (*see* Doc. 11-7 at 4 ("Cover is an essential

component of both habitat effectiveness and security for elk and other big game.

Loss of cover results in a decline in both."))—that would constitute a "significant

change" from the 1986 Forest Plan and require amendment consistent with NFMA

and NEPA.  It was therefore arbitrary and capricious for the agency to not perform

additional environmental review.

## V.    ESA

Plaintiffs' only remaining ESA claim regards the grizzly bear (Claim I),

which is listed as a threatened species under the ESA.  FS_108470.  Grizzly bears

are present in both the Helena National Forest, FS_108438, and in the Project area,

FS_108471.  The Project area is located in the southern portion of the Northern

Continental Divide Ecosystem ("NCDE") Grizzly Bear Recovery Zone,

FS_108470, within the Landers Fork Bear Management Unit and includes portions

of the Arrastra and Red Mountain sub-units, FS_108471.  Subsequent to the Park

Creek Fire, the 2019 ROD restricts all Project activities to the Arrastra subunit.[10]

---

[10] The record refers to this both as the Arrastra Mountain subunit, *see, e.g.,*

FS_108471, 096615.

The ESA mandates that each federal agency prepare a biological assessment for any ESA-listed or proposed species that may be present in an action area. 16 U.S.C. § 1536(c)(1). If the biological assessment concludes that the proposed action "may affect" but will "not adversely affect" a listed species, the action agency must receive a letter of concurrence from the Fish and Wildlife Service. 50 C.F.R. §§ 402.14(b)(1), 402.12(k)(1). If the action is "likely to adversely affect" a listed species, the action agency must receive a biological opinion from the Fish and Wildlife Service. 16 U.S.C. § 1536(a)-(c); 50 C.F.R. § 402.14. Reinitiation of consultation may then be subsequently required if, *inter alia*, new information is identified or the action is modified. *See id.* § 402.16.

While the original Biological Assessment for the Project was prepared in 2016, *see* FS_108437; *see also* FS_104598–655, the Forest Service amended its Forest Plan management directions for grizzly bears in 2018, *see* FS_106886. The Fish and Wildlife Service provided a new programmatic Biological Opinion and Incidental Take Statement for this Forest Plan amendment for grizzly bears ("programmatic opinion") in 2017. *See* FS_103103–290. The programmatic opinion specifically states that it "does not provide an analysis for effects of specific actions." FS_103110. On February 12, 2021, the Forest Service

---

FS_103216, and the Arrastra Creek subunit, *see, e.g.*, FWS_000146.

reinitiated ESA consultation for the Project for grizzly bear, lynx, lynx critical habitat, and whitebark pine.  FS_108431; FWS_000100–01, 000105–69.[11]

In its Revised Biological Assessment for Terrestrial Wildlife Species, the Forest Service admits that "some displacement of bears is expected while treatments are being implemented" for the Project.  FS_108473.  The Forest Service also admits that "in the short term there will be a reduction in cover and forage, increased potential for displacement of bears and an increased risk of bear/human conflicts" caused by the Project's implementation.  FS_108481.  Nevertheless, the Forest Service concluded that the project may affect but is not likely to adversely affect the grizzly bear.  *See* FS_108481.  This determination was based on the fact that the Arrastra subunit would continue to meet access management objectives during and post-implementation and an expectation that the Project would actually improve the landscape for grizzly bears in the future.  *See* FS_108481.  On April 28, 2021, the Fish and Wildlife Service issued a concurrence letter, agreeing with the Forest Service's may affect, not likely to adversely affect, conclusion.  FS_111138; FWS_000003–5.

## A.     Mootness

As a threshold issue, Defendants argue Plaintiffs' reinitiation claim was

---

[11] The cover page of the Revised Biological Assessment clarifies that document should be dated "2021" instead of "2018."  *See* FWS_000105.

mooted by the February 2021 Revised Biological Assessment. *See* FS_108434–98. "Federal courts lack jurisdiction to consider moot questions or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Forest Guardians .v Johanns*, 450 F.3d 455, 461 (9th Cir. 2006) (internal quotation marks and alteration omitted). "An action is moot if it has lost its character as a present, live controversy." *Id.* (internal quotation marks omitted). The party asserting mootness has a "heavy" burden; it must "establish[] that there is no effective relief that the court can provide." *Id.* "[A] case is not moot where *any* effective relief may be granted." *Id.*

Defendants first argue that Plaintiffs knew before they filed their complaint that the agencies planned to reinitiate consultation in response to the Park Creek Fire. (*See* Doc. 19-2 at 2–3 (July 7, 2020 response to Plaintiffs' ESA Notice of Intent to Sue).) Plaintiffs persuasively argue, however, that even if the agency planned to engage in reinitiation following the Park Creek Fire and the Forest Plan amendments, it did not do so until February 2021, two months *after* the present lawsuit was filed. Accordingly, the lawsuit was not immediately moot. But the question remains whether Plaintiffs' grizzly bear claim has since been mooted.

Plaintiffs' claim is premised on the Forest Service's failure to reinitiate consultation based on the 2017 programmatic opinion. (*See* Doc. 1 at ¶¶ 171–76.) More specifically, Plaintiffs pled that the reinitiation was required to address two

specific matters: (1) a limitation on activity in more than three adjacent grizzly

bear management subunits and (2) a five-year durational limitation.  (*See id.* at

¶ 174.)  Plaintiffs maintain that the 2021 consultation failed to address these issues

and the Court could order their consideration on remand.  Defendants do not really

respond to this argument in the context of mootness; rather, Defendants argue the

2021 consultation complies with the 2017 programmatic opinion.  Ultimately,

while the agency engaged in the act of reinitiation, Plaintiffs continue to seek a

declaration that the agency did not comply with the law.  As was the case in *Forest

Guardians*, Plaintiffs' grizzly bear claims are not moot because the 2021

reinitiation "is not the only form of effective relief" sought.  450 F.3d at 462.

### B.  "Three-adjacent sub-unit" Term and Condition

    Plaintiffs first argue that most recent consultation failed to consider the

"three-adjacent-subunit" requirement.  Pursuant to the 2017 programmatic opinion,

> Concurrent, temporary increases in [open motorized route density] or
> [total motorized route density], or concurrent temporary decreases in
> secure core for projects (*as defined the glossary for the NCDE*) on
> [National Forest System] lands shall not occur in more than 3 adjacent
> grizzly bear management subunits on each National Forest.

FS_103218.  Plaintiffs insist this standard has been violated here because the

Center Horse Project is occurring on three subunits in the Lolo National Forest—

the South Scapegoat, Monture, and Morell-Dunham subunits—and the Arrastra

subunit (where Stonewall Project activities will occur) borders the South

Scapegoat subunit.  Thus, the agencies were required to consider the fact that there are four adjacent subunits where project activities would occur.

Defendants present numerous arguments in response.  First, according to Defendants, the Center Horse Project never occurred because of the Rice Ridge Fire of 2017.[12]  (*See* Doc. 19-3 at 3.)  Plaintiffs counter, however, that the project is proceeding, simply refashioned as the Center Horse Restoration Project.  Both parties are correct.  As argued by Defendants, the Center Horse Restoration Project no longer includes vegetation management, (*id.* at 2–3, 25), and the majority of the proposed activity will occur only in the non-adjacent Morrell-Dunham subunit, (*id.* at 31).  But, as argued by Plaintiffs, that still includes travel management activity, (*see id.* at 2–3), and that project area still includes the South Scapegoat, Monture, and Morrell-Dunham subunits, (*id.* at 28, 31).  Thus, the rechristened Center Horse Restoration Project still implicates project activity in three subunits, one of which is directly adjacent to the Arrastra subunit.

Second, Defendants argue that because the Arrastra subunit meets the Forest standard for road densities, known as the 19/19/68 objective,[13] there is no take in

---

[12] Neither party addresses the fact that the Center Horse Restoration Project documents are not in the Stonewall Administrative Record.  (*See* Docs. 19-3, 19-4.)  Their consideration is appropriate, however, to assess "whether the agency has considered all relevant factors."  *Lands Council*, 395 F.3d at 1030.

[13] This represents limiting high density (> 1 mile/square mile) open motorized access to no more than 19% of a bear subunit, limiting high density (>2 miles/square mile) total motorized access to no more than 19% of a bear subunit,

the subunit and the "three-adjacent-subunits" requirement has not been triggered. The Arrastra subunit meets the 19/19/68 guidelines "before, during, and after project implementation." FWS_000146; *see also* FWS_000152. Nevertheless, "take" is also measured under the 2017 programmatic opinion using "spatial and temporal surrogates" such as the "three-adjacent-subunit" requirement. *See* FS_103216. Thus, compliance with the 19/19/68 objective does not obviate the duty to consider adjacent subunit activity.

Finally, Defendants argue that Plaintiffs make no attempt to show that either increases in route density nor decreases in core area would result, or result concurrently, under the Center Horse Restoration Project. As to the first part of Defendants' argument, there is no evidence that the Center Horse Restoration Project would result in either increases in route density or decreases in core area. To the contrary, the Center Horse project activities are limited insofar as the project does not anticipate new road construction but "proposes 2.6 miles of road construction to create re-routes and move existing sections of road away from riparian areas and streams" in specific drainages. (*See* Doc. 19-3 at 33.) Indeed, no harvest activity will occur in the South Scapegoat subunit. (*Id.* at 31.) All three subunits also have "large blocks of existing security core," (*id.* at 32), and the

---

and providing security core areas that equal or exceed 68% of each bear subunit. *See* FWS_000145.

Center Horse Restoration Project is anticipated to result in a *decrease* in total road density across all three, including a 2% decrease in the South Scapegoat subunit, (*id.* at 34, 37; *see also* Doc. 19-4 at 3).

Nonetheless, Plaintiffs correctly point out that this Court has previously determined that all impacts to road density—both good and bad—must be considered in this context. *See WildEarth Guardians v. Steele*, 2021 WL 2590143, at *16 (D. Mont. June 24, 2021) ("Plaintiffs are correct that 'impacts' could mean any degree of change, upwards or downwards . . . ."). At oral argument, Defendants focused on the distinction between "impacts" and "increases," emphasizing that the condition at issue uses the term "increases." *See* FS_103218. Defendants, ignore, however, that the purpose behind this spatial surrogate is to "provide grizzly bears within a project unit the opportunity to move away from activities into an undisturbed subunit." FS_103217. Accordingly, the condition applies "if a project *impacts* [road density] or secure core in more than three adjacent subunits." FS_103217 (emphasis added). To the extent the agency's use of both "increase" and "impact" results in an ambiguity, that ambiguity is resolved in favor the species. *See WildEarth*, 2021 WL 2590143, at *16. Even if a project will eventually result in a net decrease in road density and/or increase in secure core, concurrent activities affecting these densities have the chance to limit bears' ability to avoid roads in the present. Thus, the absence of a "negative" impact does

not eliminate this consideration or mean that take will not occur.

Equally unconvincing is Defendants' attempt to limit "impacts" to road activities. As discussed above, all three subunits involved in the Center Horse Restoration Project are anticipated to experience a 1% to 3% decrease in total road density. (*See* Doc. 19-3 at 34, 37.) The Arrastra subunit at issue here is expected to cause a temporary 2% increase in open road density. *See* FWS_000146. Thus, even if "impacts" were limited to road activities, such activities are occurring in more than three adjacent subunits here.

The final question then is whether Defendants can find respite in the term "[c]oncurrent." Given the projected length of both projects, the answer based on the current record is "no." For the Stonewall Project, "[i]t is anticipated that all timber harvest will be completed within four years and burning of harvest units completed within five-six years. Low severity prescribed fire only treatments and hand thinning of precommercial thin units are anticipated to be completed within ten years." FWS_000144. While it appears that much of the work on the Center Horse Restoration Project was performed in 2018-2019, (*see* Doc. 19-3 at 31), that project is anticipated to "extend up to ten years from the initiation of road decommissioning, storage and road relocation," (*id.* at 5). Thus, project activities, specifically road-related activities, will overlap.

Ultimately, the agency was required to reinitiate consultation because of

concurrent activities in more than three subunits.  Because the agency failed to do so, remand is required.

### C.    Five-year Duration Limit

Finally, Plaintiffs argue that the 2021 consultation failed to consider NCDE-GDL-AR-01, *see* FS_103218, which provides:

> **NCDE-GDL-AR-01.** In each bear management subunit within the NCDE primary conservation area, each project (as defined by "project (in grizzly bear habitat in the NCDE)" in the glossary) should be designed so that on-the-ground implementation does not exceed 5 years to reduce the potential duration of grizzly bear disturbance or displacement due to project-related activities.   Exceptions may be made where necessary, for example to accommodate:
>
> - actions where existing rights preclude or constrain agency discretion (e.g., certain contracts, permits, leases);
>
> - prescribed burning (including slash disposal), best management practices to protect water quality, or required reforestation activities, or
>
> - emergency situations as defined by 36 CFR 218.21.
>
> If an extension of the five-year time limitation is required (e.g., to meet contractual obligations or to complete on-the-ground treatments), the reasons should be documented in writing prior to authorization of the extension.

FS_94780–81, 108491.  According to the Revised Biological Assessment:

> Standard will be met.  As described in project description of BA all logging activity was anticipated to be completed within four years which is anticipated to happen even sooner now that only 1,317 acres will be treated.   Some slash treatments within harvest units may potentially extend beyond 5 years but all logging operations will be completed in less than 5 years.

FS_108491.

The parties' dispute focuses on which activities related to the Stonewall Project fall within NCDE-GDL-AR-01.  The parties first dispute whether "slash treatments" fall under the exception for "slash disposal."  Neither party provides any record citation for a definition of either term.  But even assuming Defendants are correct, and the terms are concomitant, Plaintiffs persuasively argue that such exemptions may only be invoked "where necessary."  *See* FS_108491.  The Forest Service's compliance language merely states that slash treatments may extend beyond the 5-year limit with no assessment of "necessity."  *See* FS_108491.  And any such argument at this point would be an impermissible post hoc rationalization.  *See State Farm*, 463 U.S. at 50.  Nevertheless, Defendants ultimately prevail on this point.

Even if "slash treatments" do not qualify as "slash disposal," Defendants argue that neither "slash treatments" nor "hand thinning" qualifies as a "project" in this context.  This argument is persuasive.  "[P]roject (in grizzly bear habitat in the NCDE)" is defined as follows:

> a project in grizzly bear habitat in the NCDE, for purposes of the motorized access standards and guidelines in the primary conservation area of the NCDE, refer to any temporary activity requiring construction of new roads, temporary roads, reconstruction or opening of restricted roads during the non-denning season, if such use exceeds administrative use levels . . . .

FS_103263; *see also* FS_102944.  "Administrative use" is then defined as "motorized use of roads closed to the public is permitted for Federal agency personnel or personnel authorized to perform duties by appropriate agency officials, as long as it does not exceed either 6 trips (3 round trips) per week OR one 30-day limited use period during the non-denning season."  FS_103260.

Here, the only road construction is associated with commercial harvest units occurring in the first five years of the Project and "there will be no changes to public motorized access during or after project implementation."  *See* FS_108441. As a result, even if "slash treatments" or "hand thinning" are expected to last longer than five years and are not explicitly exempted, they do not meet the definition of a "project (in grizzly bear habitat in the NCDE)."

## CONCLUSION

Based on the foregoing, remand for further agency action is required in this case.  Remand may be complicated, however, by recent changes in NEPA's implementing regulations.  In September 2020, the Council on Environmental Quality revised 40 C.F.R. Part 1508 in accordance with former President Trump's Executive Order 13,868, which asserted that the "Federal Government must promote efficient permitting processes and reduce regulatory uncertainties that currently make energy infrastructure projects expensive and discourage new investments."  84 Fed. Reg. 15,495 (Apr. 15, 2019); *see also* 85 Fed. Reg. 43304,

43375 (July 16, 2020).  Pursuant to those revisions, § 1508.7's cumulative effects section was entirely repealed, and "cumulative impacts" were removed from § 1508.1's definition of "effects."  *See* 40 C.F.R. § 1508.1(g)(3) ("Cumulative impact, defined in 40 CFR 1508.7 (1978), is repealed.").  But, on January 20, 2021, President Biden issued Executive Order 13,990, revoking Executive Order 13,868.  *See* 86 Fed. Reg. 7037, 7041 (Jan. 20, 2021).  Accordingly, the Council on Environmental Quality has already proposed reinstating "cumulative impacts" in NEPA's regulatory framework.  *See* 86 Fed. Reg. 55757, 55763 (Oct. 7, 2021).  While it is the agency that ultimately suffers the consequences of this executive volte-face, it is alarming that a single executive order could result in such a drastic—and fundamental—change to NEPA's regulatory regime.  Defendants will have to suss out their path forward on remand.

Accordingly, IT IS ORDERED that:

(1)    Plaintiffs' motion to supplement (Doc. 10) is GRANTED as to Exhibits 3 and 7, (Docs. 11-3, 11-7), and as to the exhibits attached at Doc. 22-1. The motion is DENIED in all other respects.

(2)    Plaintiffs' motion for summary judgment (Doc. 14) is GRANTED as follows:

(a)    Plaintiffs prevail on Claim IV insofar as the Forest Service failed to adequately consider Forest Plan Standard 6.

(b)   Plaintiffs prevail on Claim V.  The 1982 viability rule applies and the agency failed to demonstrate compliance with that rule.  Additionally, the Forest Service failed to adequately consider alternatives, failed to consider the reasonably foreseeable impacts of the Middleman Project, and was required to treat Amendment #35 as a "significant" change to the Forest Plan.

(c)   Plaintiffs prevail on Claim I insofar as Defendants were required to reinitiate consultation on the grizzly bear because of concurrent project activities in more than three subunits.

(3)   Defendants' motion for summary judgment (Doc. 18) is GRANTED in all other respects.

(4)   The 2019 ROD is VACATED.  This matter is remanded for further agency action consistent with this Order.

DATED this 13th day of December, 2021.

Donald W. Molloy, District Judge
United States District Court